## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| ALBERT YALE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:15-cv-403-RJC-DSC |
| vs. | ) | |
| | ) | |
| COMMUNITY ONE BANK, N.A., | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | Jury Trial Demanded |

COME NOW Plaintiffs and for their First Amended Complaint against defendant Community One Bank, N.A., allege the following:

### JURISDICTION AND VENUE

1.      The Court has original jurisdiction of this action under 28 U.S.C. §1332 because the parties are completely diverse in citizenship and the matter in controversy exceeds the sum of $75,000.

2.      Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" within the geographical area of this court.

### PLAINTIFFS AND DEFENDANT

3.      The Plaintiffs are Albert and Marilyn Yale, residents of Florida; Mary Lynn Van Horn, resident of California; Mary Lynn Van Horn trustee for J. Lane, Diane Estes, resident of Virginia; Edward Estes III, resident of Virginia; Edward Estes IV, resident of Virginia; Ned Siegel, resident of Ohio; Claggett and Sons, Inc., an Ohio corporation with its principal place of business in Ohio; P3T, Ltd., an Ohio limited liability company with its principal place of business in Ohio; Thaddeus Claggett, resident of Ohio; Emily Claggett, resident of Ohio; William Richards, resident

of Ohio; Walter and Kathy Matney, residents of Ohio; Sharon West, resident of Ohio; Patrice Ackerman, resident of Arizona; Keith Davey, resident of Virginia; Missions to Military acct. #1, a Virginia corporation with its principal place of business in Virginia; Missions to Military acct. #2, a Virginia corporation with its principal place of business in Virginia; John Sargent, resident of Virginia; Larry and Shirley Burroughs, residents of Oklahoma; Safe Harbor Foundation, c/o Tom Prinsen, an Ohio limited liability company with its principal place of business in Ohio; CCR Data Systems, Inc., a New Hampshire corporation with its principal place of business in New Hampshire; David and Judy Abel, residents of Ohio; John and Alice McFerren, Jr., residents of Ohio; Tom Prinsen, resident of Ohio; Gerald Webber, resident of Florida; Timothy Valentine, resident of West Virginia; and Roxanne Wymer, resident of Ohio, (collectively the "Plaintiffs").

4.      In 1907 First National Bank of Asheboro was organized. In 1976 the bank changed its name to First National Bank of Randolph County. In 1985, the Bank formed a holding company, FNB Corp. In 1990 the bank changed its name to First National Bank and Trust Company to recognize new trust and investment powers. In 2000 the bank acquired Richmond Savings Bank, in 2004 Rowan Savings Bank, in 2005 Alamance Bank and Hillsborough Bank, and in 2006 First Gaston Bank, Catawba Valley Bank and Northwestern Bank. In 2006, the Bank changed its name to FNB United Corp. In 2007, the Bank changed its name to Community One Bank, N.A. In 2013, Bank of Granite merged into Community One Bank, N.A. ("Community One Bank"), creating a network of over 50 branches throughout North Carolina. Defendant Community One Bank is a North Carolina corporation with its principal place of business in North Carolina.

## BLACK DIAMOND PONZI SCHEME

5.      From April 2007 through December 2009, Keith Franklin Simmons ("Simmons") and others solicited more than four hundred investors to invest over $35 million with Black Diamond Capital Solutions, LLC and related entities ("Black Diamond"), in a lucrative foreign currency trading program. Simmons controlled an account in the name of Black Diamond at Community One

Bank and the entire $35 million was deposited into Black Diamond's fiduciary account at Community One Bank.

6.  Simmons, without the investors' knowledge, never invested any investor funds in a foreign currency trading program. Instead, Simmons used the investor funds to make bogus interest payments to induce further investments and to enrich himself by acquiring real estate and other assets, funding personal business ventures, and financing a lavish lifestyle.

7.  Simmons was able to forestall Black Diamond's collapse until his arrest by the FBI in December 2009. Simmons was indicted by a federal grand jury and charged with securities fraud and wire fraud, and aiding and abetting the same. On December 8, 2014, Simmons was re-sentenced to 40 years in prison.

8.  Simmons formed Black Diamond in 2007 and began seeking investors to invest in Black Diamond's supposed foreign currency trading program. Simmons made a variety of false statements to induce investors to invest, including the following:

(a).  Black Diamond's trading program was created by a group of highly skilled platform developers;

(b).  Black Diamond experienced great past success, including a 123% rate of return for 2006 and a 137.4% rate of return for 2007;

(c).  Black Diamond conducted trades through a commodities company named PFG Best;

(d).  Black Diamond would trade no more than 20% of the total investor's funds in foreign currency trading and the rest of their investment would be invested in secure U.S. treasuries; and

(e).  Black Diamond maintained an account with JP Morgan Chase with a balance at one time of $77 million.

9. Simmons generated new investors by promoting the Black Diamond foreign currency trading platform to select individuals and promising those individuals a share of Black Diamond's return for every new investor they brought into Black Diamond.

10. The profit sharing program promoted by Simmons caused several individuals to create their own entities, which in some cases were styled "hedge funds" in order to feed new investors into Black Diamond.

11. Deanna Salazar, Jim Jordan, and Steven Lacy formed their own entities or "hedge funds" and recruited investors to invest millions into Black Diamond. Jordan, Lacy and others used a pass through company called Divine Circulation Services in order to transfer their investor funds into Black Diamond's foreign currency trading program.

12. Instead of investing investor money into foreign trading programs, Simmons used the majority of investor monies to make over $18 million in bogus "interest" payments to investors in order to induce more investors to invest in Black Diamond.

13. Simmons also used over $4.9 million in investor monies in a series of real estate acquisitions in Ashe County, North Carolina. Simmons spent millions to fund an array of personal side business ventures ranging from an ownership interest in Extreme Fighting Championship to his real estate company called High South Realty.

14. Simmons also spent investor monies to fund his lavish lifestyle, including purchasing vehicles, decorating his home, spending investor money on women for personal reasons, and traveling on private jets. None of these expenditures were remotely related to any foreign currency trading.

15. Simmons' profligate spending eventually caught up with him in early 2009. Some investors requested proof that Simmons was in possession of their funds and others began clamoring for their "interest" payments or withdrawals of their principal. In order to lull existing investors, lure additional investors, and prolong the scheme, Simmons made the following false statements,

including that Black Diamond was going to "cash out" of their existing trading platform, and a series of paymasters were in place to conduct the wire transfers to facilitate return of investor funds.

16.     By October 2009, the sum of the quarterly statements showed that Black Diamond's investors' assets had apparently grown to approximately $423 million. In reality, their life savings invested with Black Diamond had shrunk to approximately $500. The only assets available for forfeiture were a few cars, some collectible coins, and real estate purchased by Simmons during his spending spree.

17.     In December 2009, the FBI executed a series of search and seizure warrants on Simmons' properties and arrested Simmons pursuant to a criminal complaint. Simmons submitted to a voluntary interview and confessed that Black Diamond was a Ponzi scheme and that he never engaged in any foreign currency trading. Simmons acknowledged using investor monies for his own benefit, stated that he was responsible for the scheme, and admitted that several lulling statements were lies.

18.     From at least April 23, 2007 until on or about September· 16, 2009, Simmons and his co-conspirators executed a Ponzi-style scheme to defraud multiple investors of over $35,000,000.00. Simmons and the conspirators recruited individuals, including Plaintiffs, to invest money in Black Diamond Capital Solutions and other related entities, for the stated purpose of investing in the foreign currency exchange system. Despite collecting over $35,000,000.00 based on that representation, however, Simmons did not put investor money into the foreign currency exchange. Rather, Simmons simply deposited the money into various bank accounts, including the Black Diamond account at Community One Bank, withdrew new investor money as needed to make Ponzi-style payments to other investors, and diverted other investor money to cars, real estate, expenses for side businesses, lavish trips, and other expenses unrelated to any foreign exchange.

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 5 of 46

Simmons concealed the scheme from investors with, among other ways, false representations to investors and false account statements.

19.     Simmons was a resident of West Jefferson, North Carolina, and the owner of Black Diamond Capital Solutions, LLC, Black Diamond Associates, LLC, and other related companies.

20.     Black Diamond Capital Solutions, LLC, was formed in North Carolina on or about July 19, 2005, and Simmons was its registered agent. Company documents stated that the company offers investors "exclusive access to an automatic computerized trading system." An Internet posting by Black Diamond stated that it provides "commercial lending, non-traditional finance, consulting, acquisitions and mergers." Simmons controlled an account at Community One Bank in the name of Black Diamond Capital Solutions, LLC, and Simmons was the sole signatory on that account. Upon information and belief, the signature card for the Black Diamond account identifies Northwestern Bank as a division of Community One Bank and Simmons as the sole signatory on that account.

21.     Community One Bank at all times relevant understood and was well aware of the fiduciary nature of the Black Diamond account at the Bank. The Bank knew that account held investor funds, was to serve as a conduit for investor funds, and was fiduciary in nature.

22.     Black Diamond Associates, LLC, was formed in North Carolina on or about January 8, 2008, and Simmons was its registered agent. This entity appears to be closely related to, or the same as, an unregistered company, Black Diamond Capital Group, which described itself as a commercial lending firm in Internet based promotional materials. Black Diamond Associates further claimed to be able to secure conventional financing, joint venture equity, and venture capital. Simmons controlled an account in the name of Black Diamond Associates at Community One Bank. Black Diamond Associates was almost entirely financed by investor money that Simmons diverted from Black Diamond.

23.     Eco-Green, LLC, was formed in North Carolina on or about May 8, 2008, and Simmons was its registered agent. Eco-Green's Internet-based promotional literature stated that it was a collaborative consultant whose mission was to preserve the rugged beauty of the mountains, improve lives and reduce energy costs. Simmons controlled an account in the name of Eco-Green at Community One Bank. Eco-Green generated little revenue, and its operations were funded almost entirely by investor money that Simmons diverted from Black Diamond.

24.     Red Brick Group, LLC, was formed in North Carolina on or about May 30, 2008, and Simmons was its registered agent. Red Brick Group purportedly was a sports marketing firm.

25.     The Gallery Group, LLC was formed in North Carolina on or about June 2, 2008, and Simmons was its registered agent.  The Gallery Group purportedly was a mass media and public relations firm for the other Simmons' owned companies. Simmons controlled an account in the name of The Gallery Group at Community One Bank, and Gallery Group generated little revenue, and its operations were funded almost entirely by investor money that Simmons diverted from Black Diamond.

26.     High South Realty, LLC was formed in North Carolina on or about May 3, 2007, and Simmons was its registered agent. High South Realty apparently provided some real estate services from offices in Ashe County, North Carolina, and Damascus, Virginia.

27.     Black Diamond advertised through the Internet and used personal referrals to solicit investments to be supposedly traded on the foreign exchange market. Over time, at least twelve Black Diamond investors became hedge fund managers  and recruited other investors, to include friends, family, and church associates, for the stated purpose of allegedly investing in foreign exchange markets through Black Diamond. Investors signed an "Agreement" which typical ly provided for a 50% split (or sometimes 60/40% split) of net "profits" after fees were paid. Under this agreement, the investor would earn 50% of the purported profit, and Black Diamond would keep the

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 7 of 46

remaining share. If the investor had been referred through a hedge fund manager, then Black Diamond would further divide its portion of the supposed profit with the referring hedge fund manager. Hedge fund managers also made apparent profits by receiving distributions on their own investments and charging administrative fees to their investors to supposedly administer the funds. Upon information and belief, at least 240 individuals invested at least $35,000,000.00 with Simmons and Black Diamond. The entire approximate amount of $35,000,000.00 was deposited into Black Diamond accounts. For the first eighteen months, investors were able to withdraw funds or supposed "profits." This slowed and then finally ceased in or around July 2009. Even after July 2009, however, Black Diamond continued to receive new investor deposits.

28. Upon information and belief, an investor promotional document titled "Black Diamond Capital Solutions, LLC" was provided to some potential Black Diamond investors in or about late 2008 and early 2009. It claimed that a group of software developers had created an automatic computerized trading system . It further claimed that: "The target is 4% gain a month (48% annually uncompounded) to the Account Holder and the system has exceeded target every month for the last 38 months. At the beginning of 2006, the developers created a program to trade straight foreign currencies . . . today the system is still private . . . access has been permitted to a small number of people."

29. Upon information and belief, Simmons did not trade and/or invest Black Diamond investor money as promised, but rather Simmons kept the investor money in the Black Diamond account at Community One Bank until Simmons either paid Ponzi-style distributions to investors or spent the money on personal expenses, on other people, or on Simmons' side businesses.

30. Rather than investing in the foreign currency exchange market as represented, Simmons fraudulently spent investor money in the approximate amounts on the following items set forth below (among others): approximately $19.9 million in Ponzi-style distributions to Black

Diamond investors, approximately $4.8 million in real estate purchases, including Simmons' personal residence in West Jefferson, North Carolina 28694, the land surrounding Simmons' personal residence, condominium and office space, an upscale development with houses, loft homes, restaurants, offices, and shops, approximately $2.3 million on advertising, and approximately $2.2 million on operating expenses for Simmons' side companies: Upon information and belief, Simmons diverted at least 99% of total deposits originated from investor money in Black Diamond.

31.     For over two and one-half years – from April 2007 through December 2009 – Simmons ran a Ponzi-style scheme using primarily one account, the Black Diamond account, at Community One Bank.

32.     From approximately April 23, 2007 until September 10, 2009, Simmons deposited with Community One a total of approximately $35,071,773 of investor funds into account xxx-12534 and withdrew from the Bank over the same time span approximately $35,071,883 from the same account.

33.     During the period of April 2007 to September 2009, Community One Bank received the approximate $35,000,000 in deposited funds from individual investors and hedge funds investing individual investors' money with Simmons. These investor funds were received by the Bank via wire transfer from the individual investor (such as from the investor's retirement account) or the investor's hedge fund. For example, hundreds of investor fund transfers to the Bank reflected that they were from IRAs.

34.     During the period of April 2007 to September 2009, Community One Bank wired back approximately half of the $35,000,000 to the same investors and hedge funds during the same time period. These withdrawals were used by Simmons to further his scheme.

35.     During the period of April 2007 to September 2009, Simmons operated in the small town of West Jefferson , North Carolina. It was well-known in that community that Simmons was supposedly investing in the foreign currency exchange market.

36.     Community One Bank's records clearly showed that Simmons invested no money in any foreign currency exchange, nor in any other such investment vehicle. The only transfers resembling investments of any kind were approximately $4,600,000 (or 13% of deposits) that Simmons used to buy real estate for cash, including a wide swath of land around the address Simmons provided to the Bank as his personal residence.

37.     Community One Bank's records also showed, among other things, that Simmons diverted (i) over $2,000,000 to other accounts with the Bank that Simmons controlled to operate Simmons' other businesses, (ii) nearly $800,000 in cash withdrawals, gift cards, and transfers to his personal account with the Bank; and (iii) numerous payments to support his luxurious lifestyle including payments for private jets, vehicles, and gifts.

38.     During the period of April 2007 to September 2009, Community One Bank's computer software repeatedly flagged account activity in Simmons' Black Diamond account at the Bank as potentially suspicious and the computer software issued hundreds of alerts notifying the Bank's personnel of the suspicious account activity.

39.     During the period of April 2007 to September 2009, upon information and belief, Community One Bank was alerted through its computer software to suspicious activity in Simmons' accounts during this time period. The Bank, despite being alerted to the hundreds of suspicious transactions that took place within one of Simmons' accounts over those two and one-half years, and despite its computer software repeatedly flagging Simmons' account activity as potentially suspicious, ignored the hundreds of computer alerts and did nothing stop or deter this activity.

40.     The transactions in Simmons' account activity repeatedly flagged by the Bank's computer software as potentially suspicious during the period of April 2007 to September 2009 involved cash transfers to Simmons' other side businesses, purchase of personal vehicles, personal real estate purchases, personal cash withdrawals, and numerous gift cards and purchases of lavish gifts, all using investor funds deposited into an account, the fiduciary nature of which the Bank had knowledge and was aware.

41.     Community One Bank is and at all times relevant was aware and, together with the United States as a result of its criminal prosecution of Simmons, has records showing the individuals at the Bank who would have been made aware of the hundreds of alerts generated by the Bank's computer software that repeatedly flagged Simmons' account activity at the Bank as potentially suspicious. These records in the Bank's possession, which will be obtained and disclosed in discovery, will detail the dates of the suspicious activity in Simmons' account at the Bank and the dates that the computer alerts were generated, together with the content and extent of those alerts to the Bank.

42.     Community One Bank in the Deferred Prosecution Agreement, filed in this action at Dkt. 10-2, acknowledges responsibility for conduct that relates to and involves,  in part, Simmons' Black Diamond  account and account activity at the Bank as set out in the Information, identified in Dkt. 10-2 as Appendix A, filed in this action by the Bank at Dkt. 10-1.

43.     In addition to the Bank's computer software repeatedly flagging Simmons' account activity as potentially suspicious, Simmons personally communicated with and spoke to the Bank to approve each and every wire transfer out of the Black Diamond account at the Bank. Upon information and belief, the Bank has in its possession records identifying the Bank's personnel who, and the dates on which the Bank, communicated with Simmons concerning his accounts and account activity repeatedly flagged by the Bank's computer software as potentially suspicious.

44.     Simmons hired Jennifer Dowell in or around 2007 to work as a bookkeeper for some of his companies including Black Diamond Capital Solutions. [Dkt. 15-4] at 83-86. 318-22

45.     Investor funds would come to Black Diamond primarily through wire transfers to Community One. Testimony at Simmons' criminal trial showed:

Q.      What about deposits?  How would investors get their funds

to Black Diamond, Ms. Dowell?

A.      They would wire them in, wire them to Community One Bank.

Q.      Okay.   And how would you be informed of an incoming wire?

A.      Sometimes, you know, they would tell me that they sent a

wire.   Then I would always get like a wire receipt from the

bank.

[Dkt 15-4] at 102, p. 338

Q       You said money would come into the Black Diamond account on wire

 transfers; is that correct?

A.      Yes.   Usually.

Q.      Usually?        Were there some other methods?

A.      Sometimes we would get checks, but that was like hardly

ever.

[Dkt 15-4] at 112, p. 348

46.     Black Diamond had one account at Community One and Simmons controlled that account. Testimony at Simmons' criminal trial showed:

Q.      Did Black Diamond have separate accounts at the bank, at

Community One Bank for Life Plus and Genesis Wealth?

A.      No.     Not that I -- I mean.    Not that I know of.

Q.     Okay.  So the only account at Community One was the Black

Diamond Capital Solutions account?

A.     Yes.

Q.     And who controlled that account, ma'am?

A.     Keith.

Q.     And you were also asked about wire transfers to various

hedge funds.   Do you recall that questioning?

A.     Um-hmm.

Q.     Who ultimately had to approve those wire transfers?

A.     Keith did.

[Dkt. 15-4] at 123, p. 359.

47.     Simmons would always call Community One to confirm outgoing wire transfers from

the Black Diamond account before the wires went out. Testimony at Simmons' criminal trial

showed:

Q.     Okay.  About the wire transfers going out, Ms. Dowell,

who had the last say in those wire transfers?

A.     Keith.  He would always have to call the bank and confirm

before anything could be sent out.

Q.     And who was the -- what was the main bank account you

dealt with during the time you were there?

A.     The Black Diamond Capital Solutions.

Q.     And what financial institution was that at?

A.      It was Community One.

[Dkt 15-4] at 102-03, pp. 338-39

Q.      Ms. Dowell, do you remember you were just asked whether

who ultimately approved those transfers, you said it was

Mr. Simmons. But let me ask you again:

When Mr. Daveys (sic.), Ms. Salazar or Mr. Coats would

call and direct you to do a transfer, you would transfer that

without talking to Keith?

A.      He would have -- yeah, he would have to call and confirm

it before anything could be sent from the bank.

Q.      Okay.  But you would still initiate the transfer; is that

correct?

A.      Yeah.

[Dkt. 15-4] at 124, p. 360

48.     In or around December 2008, Simmons withdrew money from the Black Diamond

account for travel to Tampa. Testimony at Simmons' criminal trial showed:

Q.      All right. I'm going to show you now 44g which is in

evidence. Again, I'm going to ask you to identify the date on

the check?

A.      December 3rd of 2008.

Q.      Where is it drawn on?

A.      "Black Diamond Capital Solutions".

Q.      What's the amount?

A.     Fifteen thousand six hundred thirty dollars.

Q.     What is in the memo line, ma'am?

A.     "Tampa."

Q.     Is that a city you traveled to?

A.     Yes.

Q.     Did you pay for the jet?

A.     No.

Q.     Do you know who paid?

A.     I – I mean, I never saw anything. But I just assumed it

was Keith.

MR. TATE: Objection; move to strike.

THE COURT: Sustained as to the assumption.

BY MR. ODULIO:

Q.     Why did you assume it was Mr. Simmons?

MR. TATE: Objection; calls for speculation.

THE COURT: Overruled.

THE WITNESS: Because he was the one, you know, that

was taking us on the trip, I mean.

[Dkt 15-4] at 109-10, pp. 345-46

49.     As part of the Ponzi scheme, Simmons wired money from the Black Diamond

account back to his co-conspirators including Jonathan Davey. Testimony at Simmons' criminal trial

showed:

Q.     And would considerable wires from Black Diamond go back

to Mr. Davey at Divine Circulation?

A.    Yeah.   We sent wires to them.

Q.    At their request?

A.    Yeah.

Q.    Did it appear to you that Mr. Daveys (sic.), Mr. Coats

and Ms. Salazar had the ability to do whatever they wanted to

do with funds in their accounts?

A.    Yeah.

[Dkt. 15-4] at 115, p. 351

50.    Money from the Black Diamond account at Community One was the primary source

of revenue for Simmons' companies. Testimony at Simmons' criminal trial showed:

Q.    Show you Government's Exhibit 2e and ask you if you know

what Echo Green, LLC is?

A.    Echo Green we did a marketing and media plan for it. And

Echo Green was a green consulting firm. They worked with --

the idea was to work with construction firms who were not

familiar with green methods of constructing. Also to work

with  – directly with clients who might want to remodel their

homes or build their homes in a green fashion.

Q.    Who controlled Echo Green?

A.    Keith Simmons.

Q.    Ms. Gibson, in terms of the Gallery Group, how much

revenue did the Gallery Group bring in from sources outside of

Black Diamond, those two clients you mentioned?

A.    Oh, very little. Very little.

Q.      Approximately, how much?

A.      Maybe about less than $5,000 I would say.

[Dkt. 15-4] at 173, p. 409.

51.     Simmons approved all of the expenses and expenditures of his various companies.

Q.      Well, did Gallery Group actually spend money?

A.      Oh yes.

Q.      Did it have expenses?

A.      Oh yes, indeed. We had salaries and we also placed quite

a bit of media and marketing.

Q.      Well, who approved those expenses?

A.      Keith Simmons approved every single cent of it.

Q.      How can you be so sure?

A.      Because the process by which we worked was -- because I

worked at ad agencies and I worked at corporations before

where I had been given budgets. And since I hadn't been given

any sort of budgets for these expenditures, the way that we

worked in every single case was to develop a recommendation

that we would send to the head of the company, which was

Keith.  And for the most part, as far as he had the purse

strings. And then we'd also send it to the person who was

head of the company in terms of name. And that would be like

Lisa, who was in charge of High South. And then we also had

Steve Ashley for Echo Green. They were heads of those

companies, as I was head of the Gallery Group. But all of the

decisions, all of the money was made – all the money was

basically approved through Keith Simmons.

[Dkt. 15-4] at 175, p. 411.

52.     As part of the Ponzi scheme, Simmons used money from the Black Diamond account

at Community One to pay the bills and expenses at his other companies and he appeared to spend

money freely. Testimony at Simmons' criminal trial showed:

Q.     Well, if no revenue coming in from outside of Black

Diamond, where was the money coming from to fund Gallery

Group?

MS. RAUSCHER: Objection, Your Honor; no foundation.

THE COURT: If she knows.

THE WITNESS: I don't know. I don't know.

BY MR. MEYERS:

Q.     Well, who was paying the bills?

A.     Keith was paying – Keith Simmons was paying the bills.

[Dkt. 15-4] at 176, p. 412.

Q.     Did the defendant ever say anything to you about where

the money came from?

A.     Occasionally he would talk about investments when we were

getting tight on cash flow, but I didn't really know anything.

Q.     What kind of spender was the defendant?

MS. RAUSCHER: Objection.

THE COURT: Overruled.

BY MR. MEYERS:

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 18 of 46

Q.    What kind of spender was he, ma'am?

A.    He seemed to be –

MS. RAUSCHER: Objection, Your Honor. It's

ambiguous what kind of spender was he?

THE COURT: Overruled.

THE WITNESS: He seemed to be quite free with his

money in terms of how he spent it.

[Dkt 15-4] at 176-77, pp. 412-13

53.    Simmons would show employees how much money he received from investors and

the amount was in the millions. Testimony at Simmons' criminal trial showed:

Q.    During the time that you worked for the defendant, did he

ever refer to how much money he supposedly had?

MS. RAUSCHER: Objection; relevance.

THE COURT: Overruled.

THE WITNESS: Several times. He would call me into

his office and pull his bank statements up on the computer

screen, kind of laugh and joke about, look at how much money I

have. And then he would quickly try to cover that up by

saying, kind of joking about the fact that, oh well, I just

got this from an investor and I have to invest it somehow.

BY MR. MEYERS:

Q.    What kind of numbers would be on the computer screen when

he was showing them to you?

A.    Several million.

Q.      How would the defendant refer to his money if he ever

did?

MS. RAUSCHER: Objection.

THE COURT: Overruled.

THE WITNESS: As his money.

BY MR. MEYERS:

Q.      What kind of spender was he?

A.      He didn't have a problem throwing out hundreds and giving

people money for no reason at all.

[Dkt 15-4] at 193-94, pp. 429-30.

54.      As part of his fraud, Simmons wrote checks drawn on the Black Diamond account

at Community One and payable to people with whom he had a personal, rather than any business,

relationship. Testimony at Simmons' criminal trial showed:

Q.      I want to show you Government's Exhibit 41d ask you if

you recognize it?

A.      I do.

Q.      Who is the payee on this check?

A.      The check was written to me.

Q.      Do you recognize the signature on the check?

A.      I do.

Q.      Whose is it?

A.      It's Keith's.

Q.      What account is this check written from?

A.      Black Diamond Capital Solutions, LLC.

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 20 of 46

Q.      What is the date on this check, ma'am?

A.      November 7 of 2008.

Q.      Did you receive this check because of your personal relationship or because of business relationship?

A.      Because of my personal relationship.

Q.      Did you have any business relationship with him at this time?

A.      No business, no.

[Dkt. 15-4] at 194-95, pp. 430–31.

Q.      I'll show you 41e. Same questions, if you remember?

A.      The check is written --

MS. RAUSCHER: Your Honor, for the record, I just want to assert the continuing objection.

THE COURT: We had that at sidebar. Overruled.

MS. RAUSCHER: Thank you.

THE WITNESS: The check is written to me from Keith in January 2009.

BY MR. MEYERS:

Q.      Which account is it out of, please?

A.      The same, Black Diamond Capital Solutions.

Q.      Was this written to you because of your personal or business relationship?

A.      Personal.

Q.      Show you 41f. Who is the payee on this check?

A.    Again, written to me.

Q.    What is the date, please?

A.    February of 2009, written by Keith out of Black Diamond
Capital Solutions.

Q.    What is the amount, please?

A.    Nine thousand dollars.

Q.    Show you 41g. What is the date on this check, please?

A.    March of 2009.

Q.    Who is it paid to?

A.    To me.

Q.    Out of which account, please?

A.    Black Diamond Capital Solutions.

Q.    Who signed it?

A.    Keith.

Q.    Is this because of your personal relationship?

A.    It was.

[Dkt 15-4] at 195-96, pp. 431-32.

55.    Simmons wrote checks drawn on the Black Diamond account at Community One to
purchase or pay off vehicles for women with whom he had a personal, rather than business,
relationship. Testimony at Simmons' criminal trial showed:

Q.    Did the defendant give you anything else of value besides
these checks after you stopped working for him?

A.    He did.

Q.    What did he give you?

A.     He had written a check to Car Max for a vehicle.

Q.     I'm gonna show you now Government's Exhibit 41i which has not yet been admitted into evidence. I'll ask you if you recognize it, ma'am?

A.     I do.

Q.     What is it?

A.     It is the purchase order for my vehicle.

MR. MEYERS: At this time I would move Government's Exhibit 41i into evidence.

MS. RAUSCHER: Subject to the same objection, Your Honor.

THE COURT: Over objection, overruled. It will be admitted.

MR. MEYERS: May I publish to the jury?

THE COURT: You may.

(Government's Exhibit No. 41i was received into evidence and published.)

BY MR. MEYERS:

Q.     Ma'am, please identify the name at the top left-hand corner of this document?

A.     It is my name, Amanda Watson.

Q.     What was the purchase price for this vehicle?

A.     Twenty-one five ninety-nine – twenty-one thousand.

Q.     What was the date in which this vehicle was purchased, if

you remember?

A.    I don't remember the exact date. In December.

Q.    December of what year, please?

A.    Of 2009.

Q.    December 2009?

A.    Correct. Or, I'm sorry, December of 2008. Not last

year, year before.

Q.    Year before last?

A.    Year before last, I'm sorry.

Q.    Let me show you now Government's Exhibit 41h, ask you if

you recognize it?

A.    I do.

Q.    How do you recognize it?

A.    That is the copy of the check written to Car Max for the

vehicle.

Q.    How much was that check for?

A.    Twenty-six – roughly $26,000, a little over.

Q.    Out of which account was it written in?

A.    The same as the others, Black Diamond Capital Solutions.

[Dkt 15-4] at 196-98, pp. 432-34.

Q.    Did the defendant ever give you money because of your

personal relationship?

A.    Yes.

Q.    What did he give you?

MR. TATE: Objection; move for a mistrial.

THE COURT: Overruled.

THE WITNESS: He – he helped my mom pay off her

credit card. And he paid for a vehicle, and paid off another

vehicle that was in mine and my mom's name.

BY MR. MEYERS:

Q.      How much did he pay for your mom's credit card?

A.      It was a little over $14,000, almost $15,000.

Q.      And you said he paid off a debt for a car?

A.      Yeah.

Q.      Let me show you Government's Exhibit 42b which is in

evidence. Do you recognize this document?

A.      Yes.

Q.      How do you recognize it?

A.      This was when he paid off the Jetta that I own and the

Volkswagon Beetle, together.

Q.      So he paid off two cars that you owned?

A.      Yes.

Q.      And what is the name of the remitter on this check,

please?

A.      Black Diamond Capital Solutions.

Q.      How much is the check for?

A.      Thirty thousand nine hundred seventy-eight dollars and

fifty-nine cents.

Q.      Ma'am, I'll show you Government's Exhibit 42a and ask you if you recognize it?

A.      Yes.

Q.      How do you recognize it?

A.      This was for the Mazda RXA.

Q.      How much was this check, please?

A.      The Mazda RXA $21,722.71.

Q.      Which account did this come out of, please?

A.      Black Diamond Capital Solutions.

Q.      Was this because of your personal relationship?

A.      Yes.

[Dkt 15-4] at 204-06, pp. 440-42.

56.      Tyiesha Nixon, special agent with the Internal Revenue Service, Criminal Investigation Division, reviewed and considered Black Diamond Capital Solutions bank records from Community One Bank and prepared a summary of investor deposits received by Black Diamond as well as wire transfer and deposit account activity between April 2007 and August 2009. The summary identifies the wire transfer statements related to the Black Diamond account. [Dkt. 15-5] at 54-58, pp. 593–97. Special agent Nixon also prepared a summary of expenditures made using investor money from the Black Diamond account at Community One Bank between April 2007 and August 2009. [Dkt 15-5] at 63, p. 602. During this time, Simmons misappropriated investor funds totaling more than $34 million. [Dkt 15-5] at 66, p. 605. The United States offered Special agent Nixon's summaries into evidence at Simmons' criminal trial.

57.      Simmons was the sole signature holder on the Black Diamond account at Community One. Testimony at Simmons' criminal trial showed:

Q.     This is Government's Exhibit 3a, Agent Nixon.

A.     Yes.    This is the signature card for – says,

"Northwestern Bank". But that's a division of CBB, Community

One Bank account. It has for Black Diamond Capital Solutions

and Keith S. Simmons.

Q.     This account you analyzed in connection with 60a and 60b;

is that correct, ma'am?

A.     Yes.

Q.     Who is the sole signature holder on it?

A.     Keith Simmons.

[Dkt. 15-5] at 68-69, pp. 607–08.

58.    Simmons drew checks on the Black Diamond account at Community One using

investor funds to make Ponzi scheme payments. Testimony at Simmons' criminal trial showed:

Q.    Okay.   On your left is 40a. I'm going to take you to

page 11 and ask you to describe what that is, ma'am?

A.     This is an official check paid to Grady Lenon Trust in

the amount of $271,688.21 dated January 10th, 2008.

Q.     Who is the remitter according to the check?

A.     Keith Simmons.

Q.    Did you trace where the money came from?

A.    I did.

Q.    Show you now page 22 of Government's Exhibit 33a. Would

you tell the jury what you found?

A.    I found that this official check was drawn on Black

Diamond Capital Solutions bank account.

Q.    What is the source of that money, ma'am?

A.    Investor funds.

[Dkt. 15-5] at 69, p. 608.

59.    As part of his Ponzi scheme, Simmons misappropriated investor funds drawn on the

Black Diamond account at Community One to purchase real estate for himself. Testimony at

Simmons' criminal trial showed:

.    Q.    Show you now page 22 of Government's Exhibit 33a. Would

you tell the jury what you found?

A.    I found that this official check was drawn on Black

Diamond Capital Solutions bank account.

Q.    What is the source of that money, ma'am?

A.    Investor funds.

Q.    In connection with your analysis of the real estate,

Agent Nixon, did you identify additional purchases made by the

defendant with investor funds of property surrounding this

particular residence?

A.      I did.

[Dkt. 15-5] at 69–70, p. 608–09.

Q.      Take you now to Government's Exhibit 40s, which is in evidence, page two. What is this, ma'am?

A.      This is a certified warranty deed for duplex on Ridge Crest Ave. in West Jefferson.

Q.      Take you now to Government's Exhibit 40s-1. What funds were used?

A.      Investor funds were used. And it's an official check drawn on the Black Diamond Capital Solutions bank account totaling $89,448.

[Dkt. 15-5] at 73, p. 612.

Q.      Okay.  Take you now to Government's Exhibit 40v-1. Are you familiar with 40v-1, Agent Nixon?

A.      I am.

Q.      What property is this one related to? See if I can rephrase.

Did there come a time when you actually went and looked at some of the properties?

A.      Yes.

Q.      And did you take photos of those properties?

A.      Yes.

Q.    And 40v-1, which property is that related to?

A.    That one is related to condo number 230.

Q.    That's in West Jefferson?

A.    Yes.

Q.    Who is the remitter?

A.    Black Diamond Capital Solutions.

Q.    What is the amount?

A.    It's $247,108.78.

Q.    And you testified that you -- first off, are these

investor funds?

A.    Yes.

Q.    How do you know?

A.    Because they -- the check was drawn on Black Diamond

Capital Solutions, which was made up of investor deposits.

[Dkt. 15-5] at 73-74, pp. 612-13.

Q.    In connection with your analysis of the real estate, did

you identify a purchase of acreage on Buck Mountain?

A.    I did.

Q.    Is that in Ashe County, ma'am?

A.    Yes.

Q.    Take you now to Government's Exhibit 40f, page two. What

is this?

A.    This is a closing statement for 47.7 acres adjoining Buck

Page 30 of 46

Mountain Heights in West Jefferson, North Carolina.

Q.      What does it say there for the total cashier's check from

buyer, the price?

A.      It's $1,697,958.80.

Q.      Who is the buyer?

A.      The buyer, Keith Simmons for Black Diamond Capital

Solutions.

Q.      Take you now to page 15 of the exhibit. Agent Nixon,

what are we looking at here?

A.      This is an official check used to pay for the acreage on

Buck Mountain from Black Diamond Capital Solutions, totaling

        $1,697,958.80.

Q.      What is the date, ma'am? 3

A.      April 7, 2008.

Q.      What funds were used to make this purchase?

A.      Investor funds.

[Dkt. 15-5] at 80-81, pp. 619–20.

60.      As part of his fraud, Simmons misappropriated millions of dollars of investor funds

through cash withdrawals and transfers of funds in the Black Diamond account at Community One.

Testimony at Simmons' criminal trial showed:

Q.      What's the next item moving up?

A.      The next item are vehicle purchases that Keith Simmons

made using investor funds. The total for this is $76,936.

And that I just took checks – I believe they were all checks

made for vehicle purchases, as well as the North Carolina

certified titles. And one of the items in that was the

purchase of a Lexus by Keith Simmons.

Q.     To be clear, for each one of these you're actually

looking at the check; is that right?

A.     Yes.

Q.     And you're entering it into Government's Exhibit 60b,

that long spreadsheet?

A.     Yes.

Q.     And the check itself was in evidence in the three series?

A.     Yes.

Q.     And the corresponding exhibit number and page number if

someone wanted to look it up; is that correct?

A.     Yes.

Q.     What's the next entry there?

A.     The next entry was cash withdrawals. And I just looked

at the bank records where it shows an actual cash withdrawal.

And it had Keith Simmons' name on it. He took the cash

withdrawal.

Q.     What is that amount?

A.     This total was $312,628.

Q.     In cash?

A.      In cash.

Q.      All right. What is the next entry there?

A.      The next entry are for – these were – usually they were

transfers from other investment funds from Black Diamond

Capital Solutions bank account to Mr. Simmons' other

businesses, including Black Diamond Associates, Gallery Group,

High South Realty and Echo Green.

Q.      And the label is actually "Simmons Other Businesses"?

A.      Yes.

Q.      So you looked at transfers from the Black Diamond Capital

Solutions accounts to those other entity bank accounts?

A.      Yes.

Q.      Again, what was the time period of your review, same as 60a?

A.      Yes.

Q.      What's the total there?

A.      The total was $2,208,228.

Q.      And the source of the money?

A.      The source was investor funds.

[Dkt. 15-5] at 93–94, pp. 632–33.

61.     Simmons misappropriated more than $1 million of investor funds from the Black

Diamond account to his other businesses. Testimony at Simmons' criminal trial showed:

Q.      The item – next item is asset purchases?

A.      These were either wire transfers or checks made to

business – I'll say maybe consider a business venture. But

Mr. Simmons listed these items as a asset on a financial

statement that was seized during the search warrant, so –

Q.      The financial statement is Government's Exhibit 28d?

A.      Yes.

Q.      What is that box there total?

A.      The total is $1,100,000.

Q.      To be clear, you looked at the financial statement in

28d?

A.      Yes.

Q.      Then you looked for the corresponding actual wire

transfer records or the check items in the bank records in

Government's Exhibit 3 and 5?

A.      Yes.

Q.      And what did you come up with again?

A.      It's $1,100,000.

[Dkt. 15-5] at 94–95, pp. 633–34.

62.      As part of his Ponzi scheme, Simmons made payments of more than $19 million of

investor funds to hedge fund managers and investors and expenditures of more than $34 million using investor funds. Testimony at Simmons' criminal trial showed:

Q.     And then finally, what's the last item?

A.     The last item is payments to investors. And that also

includes payments to hedge fund managers.

Q.     What is that figure?

A.     It's $19,091,957.

Q.     And tell us again how you came up with that?

A.     I came up with that by, I looked at all of the – either

checks written – primarily wire transfers out, that were made

payable to either the hedge fund managers or individual

clients or individual investors. And I compared also the

investors to the investor account statements to make sure that

they were investors.

Q.     Whose money was used to make those payments?

A.     Investors.

Q.     Finally, there's a figure at the bottom?

A.     The bottom is the total expenditures from Government's

Exhibit 60b. And it totals $34,204,515.26.

[Dkt. 15-5] at 95–96, p. 634–35.

63.     Community One Bank agreed to participate in Simmons' fraudulent scheme by ignoring hundreds of computer generated alerts of potentially suspicious on activity in Simmons' account at the Bank, wiring funds out the Black Diamond account at the Bank on Simmons' direction despite knowing the money was investor funds being taken out of a fiduciary account.

64.     Community One Bank's knowledge of Simmons' scheme and bad faith under North Carolina's Uniform Fiduciaries Act is evidenced by and may be inferred from the Bank's willful decision to ignore hundreds of computer generated alerts of potentially suspicious activity in Simmons' account at the Bank.

65.     Upon information and belief, the transactions detailed above are among the transactions and activity in the Black Diamond account at Community One that the Bank's computer system flagged as potentially suspicious and which the Bank received, ignored, and took no preventative action.

66.     Simmons was indicted by a federal grand jury and charged with securities fraud and wire fraud, and aiding and abetting the same. On December 8, 2014, Simmons was re-sentenced to 40 years in prison.

### UNIFORM FIDUCIARIES ACT FUNDAMENTALS

67.     The Uniform Fiduciaries Act ("UFA") promulgated by the Commissioners on Uniform State Laws and adopted by more than 25 states, including North Carolina, modifies a bank's common law liabilities in dealings with fiduciaries. North Carolina codified the UFA in G.S. §§ 32-1 through 32-13.

68.     The elements of a cause of action under the Uniform Fiduciaries Act are: (1) the defendant dealt with one who was a fiduciary; (2) the fiduciary breached his fiduciary duty; and (3) the defendant had either actual knowledge of the breach or knew sufficient facts to amount to bad faith.

69.     The test of bad faith is whether it is commercially unjustifiable for the person accepting a negotiable instrument to disregard and refuse to learn facts readily available. Where circumstances suggestive of the fiduciary's breach become sufficiently obvious it is 'bad faith' to remain passive. A bank's actions are commercially unreasonable if the bank violates its normal procedures or uses procedures that unreasonably vary from general banking usage.

## COMMUNITY ONE BANK HAD ACTUAL KNOWLEDGE
## THAT SIMMONS MISAPPROPRIATED TRUST FUNDS

70.     Community One Bank was aware that Simmons was supposedly investing in the foreign currency exchange market. Nonetheless, Community One Bank, applied new investor funds to pay existing investors. Community One also assisted Simmons to launder money by paying himself from the account.

71.     Community One Bank's records confirm that Simmons misappropriated fiduciary funds by paying himself with and misappropriating investor funds from the Black Diamond account at the Bank.

72.     A typical Ponzi scheme uses new investor money to pay principal and interest to existing investors. Simmons deposited all investor funds into his account. Consequently, when Simmons paid existing investors interest from the Black Diamond account at the Bank, Community One Bank was aware that Simmons was laundering money in a classic Ponzi scheme.

73.     Community One Bank's unique role as the bank holding Simmons's account provided

Community One Bank with computer alerts to account activity that was potentially suspicious and direct knowledge that Simmons was using his account to misappropriate client funds. Community One Bank knew and ignored information that Simmons diverted money from new lenders to pay existing investors interest, in a classic Ponzi scheme.

74. Community One Bank, at all times relevant, was aware and had knowledge that the Black Diamond account at the Bank held investor funds, was a fiduciary account, and that the investor funds in the Black Diamond account did not belong to Simmons and was thereby put on notice of Simmons' fiduciary obligations.

75. The hundreds of alerts generated by Community One Bank's computer system of potentially suspicious activity in the Black Diamond account each indicated a violation of Simmons' fiduciary obligations and Bank's decision to ignore the alerts and allow Simmons' account activity to continue unchecked demonstrates the Bank's bad faith.

76. Community One Bank's decision to tolerate account activity in the Black Diamond account that it knew was a fiduciary account containing investor funds and that its computer system had flagged as potentially suspicious amounts to bad faith.

77. Community One Bank had direct knowledge that Simmons paid himself directly from investor funds in his account's. Community One Bank actively participated in Simmons's fraud by suppressing its knowledge that Simmons was misappropriating fiduciary funds. Community One Bank conspired with Simmons by not disclosing that Simmons was misappropriating fiduciary funds.

78. The hundreds of alerts generated by Community One Bank's computer system due to account activity in the Black Diamond account presented circumstances suggestive of Simmons'

Page 38 of 46

fiduciary breach and Community One exhibited bad faith by remaining passive and winking at obvious irregularities in activities of the Black Diamond account.

79.     Community One Bank failed to act in a commercially reasonable manner by staying silent upon receiving and ignoring hundreds of alerts from its computer system and uncovering Simmons's fraud. Community One Bank violated the Uniform Fiduciaries Act by not investigating Simmons' account activity further and not informing law enforcement, regulatory agencies, or the victims of Simmons's fraud.

80.     Community One Bank failed to act in a commercially reasonable manner and was commercially unjustified by staying silent upon uncovering Simmons's fraud in violation of the Uniform Fiduciaries Act.

81.     The actual and foreseeable result of Community One Bank's conduct was the loss of the funds belonging to Plaintiffs.

82.     At no time did Community One Bank take the steps necessary to withdraw from the conspiracy or otherwise abandon it. At all relevant times, Community One Bank did not withdraw from the conspiracy; they did not disavow the unlawful goals of the conspiracy; they did not affirmatively act to defeat the purpose of the conspiracy; and they did not take definite, and positive steps to disassociate themselves from the conspiracy; and at no time did they contact law enforcement, regulatory agencies, or the victims of Simmons's fraud regarding their knowledge that Simmons was misappropriating fiduciary funds.

83.     As a direct and proximate cause of Community One Bank's conduct, Plaintiffs have been damaged in the collective amount of $10 million.

84.     Community One Bank's conduct was malicious and corrupt, as well as either intentional or reckless, to a degree sufficient to support an award of punitive damages.

# COUNT I

## VIOLATION OF UNIFORM FIDUCIARIES ACT (ACTUAL KNOWLEDGE)

Plaintiffs, for their claim against defendant Community One Bank for violation of North Carolina's Uniform Fiduciaries Act, state as follows:

85.     All other paragraphs of this First amended complaint are incorporated by reference as though fully set forth herein.

86.     Community One Bank had actual knowledge of Simmons's breach of fiduciary duty and knew Simmons was misappropriating fiduciary funds.

87.     Community One Bank had express factual information that the fiduciary funds were being diverted by Simmons in violation of his fiduciary obligations.

88.     Community One Bank violated the Uniform Fiduciaries Act by not informing the many victims of Simmons's fraud, including Plaintiffs, that Simmons was diverting fiduciary funds through the Black Diamond account at the Bank account in a classic Ponzi scheme where payments to existing investors were being paid by deposits from new investors.

89.     As a direct and proximate cause of Community One Bank's conduct, Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $10 million.

90.     Community One Bank's conduct was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against defendant Community One Bank, N.A., as follows:

(a).     For an award of actual damages in an amount to be determined upon trial of this

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 40 of 46

action, which amount exceeds $10 million;

(b).     For an award of prejudgment interest at the applicable statutory rate;

(c).     For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).     For costs of this suit, including reasonable attorneys' fees; and

(e).     For such other and further relief as this Court may deem just and proper.

## COUNT II

### VIOLATION OF UNIFORM FIDUCIARIES ACT (BAD FAITH)

Plaintiffs, for their claim against defendant Community One Bank for violation of North Carolina's Uniform Fiduciaries Act, state as follows:

91.     All other paragraphs of this First amended complaint are incorporated by reference as though fully set forth herein.

92.     The test of bad faith is whether it is commercially unjustifiable for Community One Bank to refuse to learn facts readily available. *Watson Coatings v. American Express*, 436 F.3d 1036, 1041 (8th Cir 2006).

93.     Because the circumstances suggestive of Simmons's breach of his fiduciary duties were sufficiently obvious, it was bad faith for Community One to remain passive.

94.     Community One Bank's written procedures require an investigation when wrongdoing is suspected. In effect, Community One's actions as stated above were commercially unjustifiable and unreasonable.

95.     Also, general banking protocol requires that when evidence of wrongdoing is

discovered the bank must investigate. Community One Bank used "procedures that unreasonably vary from general banking usage." *Watson Coatings*, 436 F.3d at 1041.

96. Community One Bank acted in a commercially unreasonable manner in violation of North Carolina's Uniform Fiduciaries Act.

97. It was commercially unjustifiable and bad faith for Community One Bank, with actual knowledge of Simmons' involvement in the misappropriation of fiduciary funds during Community One Bank's tenure to not inquire into the source of the funds.

98. Under the UFA, Community One Bank received proceeds of misappropriated fiduciary funds and is liable because it had actual knowledge that the fiduciary breached his fiduciary obligation. Alternatively, Community One Bank's actions were commercially unjustifiable and amounted to bad faith by not investigating the source of the fiduciary funds.

99. As a direct and proximate cause of Community One Bank's conduct Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds $10 million.

100. Community One Bank's conduct was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against defendant Community One Bank, N.A., as follows:

(a). For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $10 million;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c).     For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).     For costs of this suit, including reasonable attorneys' fees; and

(e).     For such other and further relief as this Court may deem just and proper.

# COUNT III

## CONSPIRACY TO BREACH FIDUCIARY DUTY

Plaintiffs, for their claim against defendant Community One Bank for conspiracy, state as follows:

101.     All other paragraphs of this First amended complaint are incorporated by reference as though fully set forth herein.

102.     Simmons owed a special duty of trust and loyalty to Plaintiffs as investors in Black Diamond. This duty arose out of Simmons' special financial relationship of trust and confidence with Plaintiffs as promoter of Black Diamond and holder of the Black Diamond account at Community One Bank into which Plaintiffs' investment funds were transferred and deposited, and this duty imposed common law, contractual and statutory duties upon Simmons.

103.     Community One Bank and Simmons conspired with each other to perform the acts or omissions detailed above, and the Bank had full knowledge of the fiduciary nature and purpose of the Black Diamond account at the Bank and with full knowledge of the special common law duties of trust and confidence owed by Simmons to Plaintiffs as investors in Black Diamond.

104.     The Bank received and ignored hundreds of alerts generated by the Bank's computer system triggered by Simmons' account activity that the computer flagged as potentially suspicious, and ignoring the alerts generated by its computer, Community One was aware and intended to aid Simmons in his breach of his fiduciary obligations to Plaintiffs.

105.     As a direct and proximate cause of Community One Bank's conduct, Plaintiffs have been damaged by the amount of their investments in Black Diamond which, together, exceed $10 million.

106.     Community One Bank conspired with Simmons to breach Simmons' fiduciary duty

Case 3:15-cv-00403-RJC-DSC    Document 29    Filed 10/11/16    Page 44 of 46

and the Bank's conduct was a direct and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action.

107.    Community One Bank's conduct was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against defendant Community One Bank, N.A., as follows:

(a).    For an award of actual damages in an amount to be determined upon trial of this action, which amount exceeds $10 million;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in a amount that equals up to six times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

NICHOLSON LAW FIRM, P.A.
Edward H. Nicholson, Jr.
(NC Bar No. 36123)
212 S. Tryon St., Ste. 1725
Charlotte, NC 28281
Tel: (704) 223-2406
Email: nicholsonshumaker@att.net
Attorneys for Plaintiffs

JONATHAN F. ANDRES, P.C.
 /s/ Jonathan F. Andres
Jonathan F. Andres (E.D. Mo. 39531MO)
(Admitted *pro hac vice*)
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105
Tel: (314) 862-6800
Fax: (314) 862-1606
Email: andres@andreslawpc.com
Attorneys for Plaintiffs

Sebastian Rucci (E.D. Mo. 178114CA)
LAW OFFICES OF SEBASTIAN RUCCI
(Admitted *pro hac vice*)
16400 Pacific Coast Hwy, Suite 212
Huntington Beach, CA 92649
Tel: (330) 720-0398
Email: SebRucci@gmail.com
Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing memorandum of law was served this 14th day of October 2016 to H. Landis Wade, Jr., lwade@mcguirewoods.com, Matthew Orso, morso@mcguirewood.com, and Andrew R. Hand, ahand@mcguirewood.com, counsel of record for Defendant Community One Bank, N.A., by email at the addresses shown and by electronic filing via the Court's electronic case filing system.


 /s/ Jonathan F. Andres

Case 3:15-cv-00403-RJC-DSC   Document 29   Filed 10/11/16   Page 46 of 46