UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| ALBERT YALE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 3:15-CV-403-RJC-DSC |
| | ) | |
| COMMUNITY ONE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs Albert Yale, *et al.*, ("Plaintiffs"), in opposition the Motion to Dismiss Plaintiffs'

First Amended Complaint ("Motion") (docket no. 32), state:

Defendant Community One Bank, N.A. ("Community One" or "Bank") moves for a

determination of the legal standard for the statute of limitations applicable to Plaintiffs' claims. The

Bank's argument mirrors the argument offered in its Objections to a Portion of the Memorandum

and Recommendation ("M&R") of Magistrate Judge David S. Cayer regarding the initial Motion to

Dismiss, filed August 20, 2016.

Community One does not offer any new arguments or new authority issued since the M&R.

Indeed, the Bank simply repeats a statute of limitations argument that the M&R rejected as to Counts

I-II, and the Amended Complaint is simply a result of the M&R. Accordingly, as discussed below,

the Motion should summarily be denied.

## I. RELEVANT PROCEDURAL BACKGROUND

After the initial Motion to Dismiss (docket no. 9) the Complaint (docket no. 1) was

fully briefed, Magistrate Judge Cayer issued the M&R (docket no. 21) recommending that

the Uniform Fiduciaries Act ("UFA") claims in Counts I–III of the Complaint not be

dismissed on the basis of statute of limitations. *Id*. at 7. The M&R recommended that Counts IV-VIII be dismissed for failure to state a claim.

Although the UFA does not contain a specific statute of limitations, the M&R found the statutory claims in Counts I, II and III are subject to a three year statute of limitations in N.C. Gen, Stat. § 1-52(2). *Id*. at 6. The M&R favorably considered Plaintiffs' argument in opposition to the initial Motion to Dismiss that the discovery rule in N.C. Gen. Stat. § 1-52(9) applies to their UFA claims and recommended against dismissing the UFA claim under the statute of limitations because "[p]laintiffs' knowledge and their reasonableness of their due diligence necessitate fact-intensive inquiries that would better be resolved at the summary judgment state or, if necessary, at trial." *Id*. at 6-7.

On August 24, 2016, Community One filed its Objections (docket no. 22) to the M&R, and on August 29, 2016, Plaintiffs filed their Motion for Leave to File an Amended Complaint (docket no. 23). On September 27, 2016, Magistrate Judge Cayer entered an Order (docket no. 28) granting Plaintiffs motion in part. Plaintiffs filed their First Amended Complaint on October 12, 2016 (docket no. 30-1) consisting of two of the three original Uniform Fiduciaries Act claims.

## II. FACTUAL BACKGROUND

The factual background relevant to deciding the instant motion is found in the Complaint and the public record including the Bill of Information (docket no. 10-1) and Deferred Prosecution Agreement (docket no. 10-2) submitted by the Bank. The public record also includes Simmons' criminal proceeding as well as the criminal proceeding of his co-conspirator, Jonathan Davey.

## A.     Complaint

From April 2007 through December 2009, Simmons and others solicited more than four hundred investors to invest over $35 million in Black Diamond. Simmons controlled an account in the name of Black Diamond at Community One and the entire $35 million was deposited into Black Diamond's trust account at the Bank. *Complaint* (docket no. 1) at ¶ 5. Simmons, without the investors' knowledge, never invested any investor funds in the forex program. Instead, he used the investor funds to make bogus interest payments to induce further investments and to enrich himself by acquiring real estate and other assets, funding personal business ventures, and financing a lavish lifestyle. *Id.* at ¶ 6. Simmons was able to forestall Black Diamond's collapse until his arrest by the FBI in December 2009. Simmons was indicted by a federal grand jury and charged with securities fraud and wire fraud, and aiding and abetting the same. On December 8, 2014, Simmons was re-sentenced to 40 years in prison. *Id.* at ¶ 7.

From April 2007 through December 2009, Simmons ran a Ponzi scheme using primarily one account with Community One. From April 23, 2007 until September 10, 2009, Simmons deposited with the Bank a total of $35,071,773 of investor funds into account xxxx12534 at Community One Bank and withdrew from the Bank over the same time span $35,071,883 from the same account. *Id.* at ¶ 21. When Simmons opened his account at Community One, the Bank was aware that account xxxx12534 for Black Diamond was a fiduciary account set up to hold deposits from investors for the foreign currency exchange transactions. *Id.* at ¶ 23.

Community One received the approximately $35 million in deposited funds from individual investors and hedge funds investing individual investors' money with Simmons. These investor funds were received by the Community One via wire transfer from an individual investor (such as from

the investor's retirement account) or the investor's hedge fund. Hundreds of investor fund transfers to Community One reflected that they were from IRAs. *Id*. at ¶ 24. Community One wired back approximately half of the $35 million to the same investors and hedge funds during the same time period. These withdrawals were used by Simmons to further his scheme. *Id*. at ¶ 25. Community One's records clearly showed that Simmons did not invest any money from the Black Diamond account in any forex program, nor in any other such investment vehicle. The only transfers resembling investments of any kind were approximately $4.6 million that Simmons used to buy real estate for cash, including a wide swath of land around the address Simmons provided to the Bank as his personal residence. *Id*. at ¶ 26.

Community One Bank's computer software repeatedly flagged Simmons' account activity as potentially suspicious. *Id*. at ¶ 28. Community One entered into a deferred prosecution agreement and agreed to accept responsibility for the Bank Secrecy Act violation alleged in the criminal information filed. Community One agreed that it would not contest the violation in the criminal information. *Id*. at ¶ 31.

Community One was aware that Simmons was supposedly investing in the foreign currency exchange market. Nonetheless, the Bank applied new investor funds to pay existing investors. Community One also assisted Simmons to launder money by paying himself from the account. *Id*. at ¶ 39. Community One's records confirm that Simmons misappropriated fiduciary funds by paying himself. *Id*. at ¶ 40. A typical Ponzi scheme uses new investor money to pay principal and interest to existing investors. Simmons deposited all investor funds into his account. Consequently, when Simmons paid existing investors interest from his Trust account, Community One was aware that

Simmons was laundering money in a classic Ponzi scheme. *Id*. at ¶ 41. Community One's unique role as the bank holding Simmons's account provided the Bank with direct knowledge that Simmons was using his account to misappropriate client funds. Community One knew that Simmons diverted money from new lenders to pay existing investors interest, in a classic Ponzi scheme. *Id*. at ¶ 42. Community One had direct knowledge that Simmons paid himself directly from investor funds in his accounts. The Bank actively participated in Simmons's fraud by suppressing its knowledge that Simmons was misappropriating fiduciary funds. *Id*. at ¶ 43.

### B.      Public Record

The public record contains several relevant events. In 2010, the Court presided over Simmons' criminal trial in *United States v. Simmons*, No. 3:10-CR-23-RJC-DCK ("*Simmons*"). In 2011, The Bill of Information and DPA were filed with and received by the Court in *United States v. CommunityOne Bank, N.A.*, No 3:11-CR-122. And in 2013, the Court presided over the criminal trial of Jonathan Davey in *United States v. Davey*, No. 3:12-CR-68-RJC-DSC ("*Davey*").

### 1.      *United States v. Simmons*, No. 3:10-CR-23-RJC-DCK

In December 2009, after Simmons was arrested, the United States charged him with securities fraud, wire fraud, and money laundering and alleged that he had operated a Ponzi scheme to defraud investors of more than $35 million. *Simmons Complaint* (docket no. 3)**.**

In December 2010, Simmons was tried and convicted of stealing Plaintiffs' money. *Simmons Jury Verdict* (docket no. 39); *Def.'s Brief* (docket no. 10) at 2-3; *see also Simmons Transcript* (docket no. 85); (docket no. 86) (attached as Exhibit 4); (docket no. 87); and (docket no. 88). Testimony at Simmons' trial revealed that Plaintiffs invested in Black Diamond either directly or through one of several hedge funds. All of the Plaintiffs were referred to the forex program by third

party brokers rather than Simmons.

The Black Diamond scheme included hedge funds that were set up around the country and marketed the forex program to investors. *Id.* at 75, 83–84. During Simmons' involvement through early 2009, funds from the hedge funds flowed directly to Simmons. *Id*. at 117–18. Investor funds solicited through the hedge funds later flowed through an account set up by a third party administrator who then forwarded the money to Black Diamond. *Id*. at 75, 84. Jonathan Davey, a hedge fund manager and CPA from Ohio, served as the third party administrator. *Id.* at 77–78; (Exhibit 4) at 149-50, 159, 161-62. Davey, as administrator, was supposed to forward the investor funds to Black Diamond. *Id.* at 75. One of the hedge fund managers testified at trial and admitted to earlier pleading guilty to charges related to the Black Diamond Ponzi scheme. *Id*. at 76–77.

Although Simmons did not testify at his trial, Community One was identified at the Simmons trial as a bank where Simmons maintained a single account in the name of Black Diamond Capital Solutions. *Simmons Transcript* (docket no. 86) at 123. The government used account statements from Community One and another bank to show that more than $34 million flowed through Simmons' accounts. *Simmons Transcript* at 55-58. Paperwork for wire transfers out of the Black Diamond account at Community One showed that the wires came from Community One. *Id*. at 227. The parties in *Simmons* also stipulated that Community One is a financial institution and its activities affect interstate commerce. *Id.* at 5.

### 2. Bill of Information and Deferred Prosecution Agreement

In April 2011, four months after Simmons' trial, Community One entered into the DPA with the United States. *See Def.'s Brief*, Exhibit A (docket no. 10-1). Community One entered the DPA one day after the United States filed the Bill of Information against the Bank. *See id.*, Exhibit B

(docket no. 10-2). The government cited Community One in the Bill of Information for failure to comply with federal banking regulations under the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311, *et seq*.

On September 26, 2013, the government filed a Motion to Dismiss the charges against Community One on grounds the Bank had fully complied with its obligations under the DPA. *United States v. Community One Bank, N.A.*, No. 3:11-CR-122 ("*Community One*") *Motion to Dismiss* (docket no. 9). The motion was granted the next day. *Community One Order* (docket no. 10).

### 3. *United States v. Davey*, No. 3:12-CR-68-RJC-DSC

After the Simmons' trial, Plaintiffs awaited the trials of the third-party brokers involved in the Ponzi scheme. In February 2013, Davey was tried and convicted in connection with Simmons' fraudulent scheme. *Davey Jury Verdict* (docket no. 174) ; *see also Davey Transcript* (docket no. 274); (docket no. 275); (docket no. 276); and (docket no. 277). At his trial, Davey testified that National City Bank and Chase Bank had closed the bank accounts he maintained and used to transfer money to Black Diamond. *Davey Transcript* at 193-94. He also testified that the banks never gave him any explanation or reason why the accounts were closed. *Id.* Neither Davey nor the prosecution offered any evidence or explanation at Davey's trial why National City Bank and Chase Bank closed Davey's accounts, and neither the name "Community One" nor the Bank, according to the record, was ever mentioned or discussed during the trial. *See Davey Transcript* . The Simmons trial revealed that various hedge fund managers from around the country had been involved in the Black Diamond Fraud. Nothing at the Simmons trial, however, pointed to Black Diamond.

### C. Plaintiffs' Investment in Black Diamond

Plaintiffs' only relationship with Community One was indirect contact through Simmons or

the hedge fund managers. Plaintiffs sent their investment money either to Black Diamond's account directly by wire transfer or indirectly through the hedge fund managers and then Davey. The Simmons trial revealed that Simmons and the hedge fund managers stole Plaintiffs' investment money. It also disclosed an earlier guilty plea entered by one of the hedge fund managers in connection with the Ponzi scheme.

After 2010, Plaintiffs waited more than two years for the opportunity to attend another trial and learn more about what had happened to their money. In the interim, Plaintiffs, many of whom are elderly and suffered life altering financial loss, were never provided with any notice of Community One's involvement with Simmons or the fraud and, based on the trial testimony in 2001, they had no reason to suspect or turn their attention toward the Bank.

Plaintiffs' years of diligence was rewarded at the Davey trial. On February 7, 2013, Davey testified and, to some who heard him, he sounded evasive. His testimony indirectly raised questions about Community One. He testified in open court about the unexplained closures of the bank accounts he used to transfer monies between the hedge funds and Black Diamond. This testimony and his perceived evasiveness excited suspicion, or at least raised the intriguing possibility, that maybe Simmons' bank should have shut down Simmons' account too.

Davey's testimony in February 2013 about National City Bank and Chase Bank shutting down his accounts prompted inquiry. Working backward, Plaintiffs and their lawyers were able to piece together a puzzle that showed Community One was the epicenter of the fraud. These efforts led to the discovery of Community One's complicity in Simmons' fraudulent activities and the Black Diamond Ponzi scheme.

A number of the Plaintiffs and other victims attended Davey trial and the government

arranged for a few of them testify. As noted above, Plaintiffs did not become aware there was any restitution until 2013 and even then, the only indication they had about the money was that it was part of the Simmons lawsuit. As Community One's observes from its review of the facts, "there was no relationship at all between plaintiffs and CommunityOne Bank." *Def.'s Brief* (docket no. 10) at 12.

### D.     Deficiency In the Factual Record

Finally, missing from the factual record are the facts needed to determine when Plaintiffs, in exercise of ordinary diligence under the circumstances, should have discovered Community One's complicity in the Black Diamond Ponzi scheme and when the statute of limitations on their state law claims began to run.

## III. STANDARD OF REVIEW

Statute of limitations is considered an affirmative defense under Federal Rule of Civil Procedure 12(b)(6). The Fourth Circuit "[has] noted that asserting an affirmative defense, like a statute of limitations defense, in a motion to dismiss presents a particular 'procedural stumbling block' for defendants." *CSX Transportation, Inc., v. Gilkison*, 406 Fed. Appx. 723, 728 (4th Cir. 2010). Accordingly, the rule in the Fourth Circuit is:

> [A] motion to dismiss filed under Federal Rule of Procedure 12(b)(6) generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred. But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6). This principle only applies, however, if all facts necessary to the affirmative defense clearly appear *on the face of the complaint.* To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to an affirmative defense even before the affirmative defenses are raised.

*Id.* (emphasis in original) (citatios and internal quotations omitted); *compare Horton v. Carolina Medicorp, Inc.*, 472 S.E.2d 778, 780 (N.C. 1996) (statute of limitations defense properly asserted in motion to dismiss if it appears on face of complaint statute bars claim).

Unless a case qualifies as "one of the 'rare circumstances' in which Rule 12(b)(6) dismissal of the [Plaintiffs'] claims as time–barred [is] appropriate[,]" a statute of limitations affirmative defense "is more properly reserved for consideration on a motion for summary judgment." *CSX Transp.,* 406 Fed. Appx. at 730 (citations omitted); *see also Dickerson v. TLC The Laser Eye Center Inst., Inc.*, 493 Fed. Appx., 390, 393 (4th Cir. 2012) (same).

## IV. ARGUMENT

In 1923, North Carolina adopted the Uniform Fiduciaries Act. *Maryland Cas. Co. v. Bank of Charlotte*, 340 F.2d 550, 551 (4th Cir. 1965). The authors of this law undertook to define the potential liabilities of third parties dealing with fiduciaries. *Id.*, *see generally,* N.C. Gen. Stat. § 32-1 through 32-13. The UFA also provides the following guidance in cases and situations not specifically provided for in the Act: "In any case not provided for in this Article the rules of law and equity, including the law merchant and those rules of law and equity relating to trusts , agency, negotiable instruments and banking, shall continue to apply." *Id.* at § 32-12. The UFA also stresses the importance of uniformity of interpretation of the Act: "This Article shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." *Id.* at § 32-13.

Section 1-52(2) of the N.C. General Statutes provides a three year statute of limitations for an action "[u]pon a liability created by statute, either state or federal, unless some other time is mentioned in the statute creating it." Section 1-52 of the N.C. General Statutes also provides for a discovery rule. Section 1-52(9) provides that "[f]or relief on the ground of fraud or mistake, the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C. Gen. Stat. § 52-1(9).

While it is undisputed that North Carolina's UFA does not contain a specific statute of limitations, the Act mandates that it be interpreted and constructed in a way that effectuates its general purpose of uniformity among the states that adopt the Uniform Fiduciaries Act. *Id*. at § 32-13. Illinois is another state that enacted the Uniform Fiduciaries Act, now titled Fiduciary Obligations Act. 760 ILCS 65/0.01 through 12; *see County of Macon v. Edgcomb*, 274 Ill. App. 3d 432, 435; 654 N.E.2d 598 (Ill. App. 4th Dist. 1995).

In *Continental Casualty Co. v. Am. Natal. Bank and Trust Co.*, 329 Ill. App. 3d 686, 768 NE 2d 352 (Ill. App. 1st Dist. 2002) the court recognized that a discovery rule applies to UFA claims and the three-year statute of limitations in Illinois does not begin to run until the plaintiff discovers or should have discovered the defendant's violation. *Id*., at 363-64, 366. The court in *Continental Casualty* applied the discovery rule to plaintiff's Fiduciary Obligation Act claims after noting that "[the discovery rule was created to alleviate the harsh consequences that would flow from a literal application of a limitations period." *Id*. at 364.

11

Applying the discovery rule to plaintiff's claims under the Act, the court correctly observed that "the relevant statute of limitations is tolled until the plaintiff knows or reasonably should know of the wrongfully caused injury" by the defendant. *Id*.

The discovery rule in N.C. Gen. Stat. § 1-52(9) means "that the cause of action will be deemed to have accrued from the time when the fraud or mistake was known or should have been discovered in the exercise of ordinary diligence" under the circumstances. *Darsie*, 589 S.E.2d at 397 (citations omitted); *Brissett v. First Mt Vernon Indust. Loan Assoc.*, 756 S.E2d 798, 806 (N.C. Ct. App. 2014). Ordinarily, this exercise of reasonable diligence "is a question of fact for the jury, particularly where the evidence is inconclusive or conflicting." *Darsie* at 397.

The absence of reasonable diligence may be established as a matter of law only where "the evidence is clear and shows without conflict that the claimant had both the capacity and opportunity" to discover the fraud or mistake but failed to do so. *Id*. Opportunity to discover fraud or mistake from a document is not established as a matter of law simply because the document is filed publicly. *Spears v. Moore*, 551 S.E.2d 483, 485 (N.C. Ct. App. 2001). Defendant in *Spears* obtained summary judgment after arguing that plaintiff's claim were time–barred because she had opportunity to discover the alleged fraud from language on a map publicly recorded. *Id*. The appellate court rejected that argument. The court in *Spears* considered it improper to "speculate on what circumstances should have led [plaintiff] to discover the mistake more than three years" before filing her lawsuit and reversed the entry of summary judgment. *Id*.

Finally, there is no evidence that the government's charge against Community One in 2011 for violation of the BSA and the $400,000 the Bank agreed to pay under the DPA reasonably informed Plaintiffs of the Bank's fraud or mistake or their injury at the hands of the Bank. *See Complaint* at ¶ 30 (alleging Bank charged under 31 U.S.C. §§ 5318, 5322). The BSA is a comprehensive federal statutory scheme  that, *inter alia*, requires banks to maintain certain reports and records. *See Bottom v. Bailey*, 767 S.E.2d 883, 887 (N.C. Ct. App. 2014). The BSA provides for civil and criminal penalties but no private cause of action is available under of the Act. *Id.*; *see also Taylor & Co. v. Bank of America Corp.*, 2014 WL 3557672, *3 (W.D.N.C June 5, 2014); *see also* 31 U.S.C. §§ 5321–22.

The M&R, under principles provided in North Carolina's UFA and N.C. Gen. Stat. §§ 1-52(2), (9), properly recommends applying a discovery rule to the three year statute of limitations applicable to UFA claims in Counts I-II. While the UFA does not provide for a specific statute of limitations, the Act does calls for application of the UFA uniformly with other states that have adopted it. As discussed, Illinois is an example of a state that applies the discovery rule to the UFA in that state. Community One fails to cite any UFA cases to the contrary from North Carolina or any other state that has adopted the UFA.

Similarly, Community One fails to provide any case law in support of its apparent argument that the three year statute of limitations in N.C. Gen. Stat. § 1-52(2) and the discovery rule in N.C. Gen. Stat. § 1-52(9) are mutually exclusive. Instead, under the principles announced in § 32-12 of the UFA, the rules of law and equity continue to apply

to UFA claims and to analysis of when the statute of limitations begins to run on such claims.

*See, e.g., J. Lee Peeler & Co., Inc., v. Make-peace*, 384 S.E.2d 283, 284 (N.C. Ct. App. 1989)

(equitable claim for constructive trust requiring proof of fraud held a claim seeking relief on grounds

fraud).

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendant Community One Bank,

N.A.'s Motion to Dismiss.

NICHOLSON LAW FIRM, P.A.
Edward H. Nicholson, Jr.
(NC Bar No. 36123)
212 S. Tryon St., Ste. 1725
Charlotte, NC 28281
Tel: (704) 223-2406
Email: nicholsonshumaker@att.net

JONATHAN F. ANDRES P.C.

 /s/ Jonathan F. Andres
Jonathan F. Andres (E.D. Mo. 39531MO)
Admitted pro hac vice
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105
Tel: (314) 862-6800
Email: andres@andreslawpc.com

Sebastian Rucci (E.D. Mo. 178114CA)
LAW OFFICES OF SEBASTIAN RUCCI
Admitted pro hac vice
16400 Pacific Coast Hwy, Suite 212
Huntington Beach, CA 92649
Tel: (330) 720-0398
Email: SebRucci@gmail.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing memorandum of law was served this 7th day of November 2016 to H. Landis Wade, Jr., lwade@mcguirewoods.com, Matthew Orzo, morso@mcguirewood.com, and Andrew R. Hand, ahand@mcguirewood.com, counsel of record for Defendant Community One Bank, N.A., by email at the addresses shown and by electronic filing via the Court's electronic case filing system.

  /s/ Jonathan F. Andres         
