IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| ALBERT YALE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Civil Action No. 3:15-cv-403-RJC-DSC |
| | ) | |
| COMMUNITYONE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT COMMUNITYONE BANK, N.A.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant CommunityOne Bank, N.A. ("CommunityOne" or the "Bank"), pursuant to Federal Rule of Civil Procedure 56, respectfully submits this brief in support of its Motion for Summary Judgment.

## I. INTRODUCTION

This lawsuit is limited to two claims arising under North Carolina's version of the Uniform Fiduciaries Act ("UFA"). *See* First Amended Complaint (D.E. No. 30-1). The two claims relate to a bank account opened by Keith Simmons ("Simmons") at CommunityOne in 2005 in the name of Black Diamond Capital Solutions, LLC (the "Black Diamond Account"), and to Simmons' illegal activities involving that account during the period 2007 through 2009. Simmons was arrested by the FBI in December 2009 and convicted in 2010 for engaging in a Ponzi scheme.

Count I alleges that CommunityOne had actual knowledge of bad acts committed by Simmons with respect to the Black Diamond Account. Count II alleges that the Bank acted in bad faith in failing to learn more about Simmons' activities relating to the Black Diamond Account.

1

Both claims depend upon proof – which does not exist in this case – that the Bank knew that Keith Simmons was a fiduciary, that the Black Diamond Account held fiduciary funds, and that Simmons diverted funds from the account in breach of a fiduciary duty. Discovery is now complete and the case is ripe for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *United States v. Lee,* 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id.* If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249-50.

## III. STATEMENT OF FACTS

Plaintiffs are the victims of illegal activity committed by two individuals, Keith Simmons and Jonathan Davey. Simmons ran a North Carolina company known as Black Diamond Capital Solutions ("Black Diamond") and Jonathan Davey ran an Ohio company known as Divine Circulation Services ("DCS").[1] Both Simmons and Davey were convicted in federal court for operating Ponzi schemes.

---

[1] Despite being in prison and not being represented by plaintiffs' counsel, Jonathan Davey was, and still is, the President of Safe Harbor Foundation, one of the Plaintiffs in this case. By way of this lawsuit, Safe Harbor Foundation seeks to recover money it authorized Jonathan Davey to send to DCS.

2

***The DCS Plaintiffs***

Jonathan Davey enticed 28 plaintiffs (the "DCS Plaintiffs")[2] to invest in DCS, promising them returns based on a private placement model of "investing Company assets through participation in the Mexbank Currency exchange program and other FOREX programs that meet our objectives." (Ex. A, Webber 36-43, Ex. B, Defendant's Exhibit 35 at 33). The DCS Plaintiffs were treated as prospective shareholders before investing with DCS. (*See, e.g.,* Ex. A, Matney 56-60, Abel 25-26; Ex. B, Defendant's Exhibit 18 at 1-7, 19-25, Defendant's Exhibit 62 at 7-27, Defendant's Exhibit 68 at 21-22). For instance, the initial letter to prospective DCS shareholders warned the DCS Plaintiffs that the "investment is Speculative and non-liquid and investors should realize they may lose their entire investment." (Ex. A, Webber 36-39, Ex. B, Defendant's Exhibit 35 at 1). The investment letter asked prospective shareholders to complete and sign: (1) a Purchaser Questionnaire; (2) a Subscription Agreement; and (3) for those investing IRA account proceeds with DCS, IRA documents that were to be sent to an IRA custodian. (*Id.*). The Private Placement Memorandum ("PPM") that prospective shareholders like the DCS Plaintiffs received with the investment letter also contained the following language:

> "OWNERSHIP OF COMMON SHARES OF THE COMPANY INVOLVES A HIGH DEGREE OF RISK AND IS NOT RECOMMENDED FOR ANY INVESTOR WHO DOES NOT HAVE A SUBSTANTIAL NET WORTH, WHO IS NOT IN A HIGH FEDERAL INCOME TAX BRACKET, AND WHO CANNOT AFFORD A TOTAL LOSS OF HIS INVESTMENT."

---

[2] The DCS Plaintiffs are: David Abel, Judy Abel, Larry Burroughs, CCR Data Systems, Emily Claggett, Thaddeus Claggett, Claggett & Sons, Keith Davey, Edward Estes, III, Diane Estes, Edward Estes, IV, Kathy Matney, Walter Matney, John McFerren, Missions to Military Account #1, Missions to Military Account #2, P3T Ltd., Tom Prinsen, William Richards, Safe Harbor Foundation, John Sargent, Ned Siegel (purportedly on behalf of his late father Howard Siegel), Timothy Valentine, Gerald Webber, Sharon West, Roxanne Wymer, Albert Yale, and Marilyn Yale. All of the DCS Plaintiffs except for Larry Burroughs dealt with Jonathan Davey at DCS. Larry Burroughs, is somewhat distinct from the other DCS Plaintiffs because he was recruited by Steve Lacy. However, records produced by Larry Burroughs show he sent money directly to DCS. (Ex. A, Burroughs 44-45, 88-89, Ex. B, Defendant's Exhibit 47 at 144).

(*Id.* at 4). The PPM also informed prospective investors that DCS would invest in various real-estate ventures, an independent movie studio, and other opportunities that met DCS's investment criteria. (*Id.* at 22). The PPM provided that "the Company's focus is to provide a high level of income for the shareholders" and outlined how DCS would distribute earnings to Class A shares as dividends. (*Id.* at 24). DCS Shareholders were updated on company dividends, (*See* Ex. A. Matney 55-57; Ex. B, Defendant's Exhibit 18 at 21), and, notably, shareholders had the right to request dividends and, if shareholders did not make a request for distribution, their dividends were automatically reinvested. (*Id.*). While the majority of the DCS Plaintiffs did not take a distribution, several of the DCS Plaintiffs requested and received distributions from DCS. (*See, e.g.,* Ex. A, Sargent 32; Richards 64-65).

After the DCS Plaintiffs invested in DCS, DCS used the money to invest in various FOREX programs, including Mexbank and Black Diamond. (Ex. C, McFerren 210; Ex. A, Valentine 59-61, Ex. B, Defendant's Exhibit 23 at 4). With respect to DCS money that went to the Black Diamond Account at CommunityOne, DCS sent the money, not the DCS Plaintiffs, and two of the DCS Plaintiffs admit that none of the money they invested with DCS was ever sent by DCS to the Black Diamond Account at CommunityOne.[3] None of the DCS Plaintiffs have been able to describe the trail that their specific DCS investments took, because they don't know exactly how DCS used their investments that became DCS capital, and with respect to money DCS invested with Black Diamond and elsewhere, funds were returned to DCS (Ex. C, McFerren 210), making the paper trail even more speculative. Indeed, after Keith Simmons's arrest, Jonathan Davey

---

[3]  As noted in Section IV.C., *infra*, Edward Estes, IV, and Ned Siegel both admitted during deposition testimony that the money they sent to DCS was never sent to Black Diamond, because DCS did not send any money to Black Diamond after March 2009.

4

informed DCS shareholders that "DCS was never 100% invested in Keith Simmons/Black Diamond, nor did DCS lose all of its funds in Black Diamond." (*See* Ex. A, Webber 52, Valentine 59-61, Ex. B, Defendant's Exhibit 35, Defendant's Exhibit 23 at 4, 2-68).

The following facts are deemed admitted[4] by 19 of the 28 DCS Plaintiffs[5] and except where otherwise indicated below, these facts apply equally to the nine other DCS Plaintiffs based on their deposition testimony:

1. The money they seek to recover in this case is money they invested with DCS;

2. By investing money with DCS, they became shareholders of DCS;[6]

3. They sent their money directly to DCS or to a bank other than DCS at the direction of DCS;

4. Jonathan Davey was their principal contact at DCS.

5. They never brought a claim against Jonathan Davey or DCS for the money they lost.

---

[4] Attached as Exhibit D is the First Set of Requests for Admission to Specific Plaintiffs (the "RFAs"), that was directed to 19 of the DCS Plaintiffs on October 31, 2017. Defendant served these requests within the discovery period set by the Court and because plaintiffs never responded to these requests, the requests are deemed admitted. Fed.R.Civ.P. 36(a) (a "matter is admitted unless, within 30 days after service of the request ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney").

[5] The RFAs were not directed to the remaining 9 DCS Plaintiffs because Defendant believed at the time that plaintiffs' counsel was going to dismiss those plaintiffs based on plaintiffs' counsel's representation. The Court allowed those plaintiffs to remain in the case and Defendant deposed them later. Except where otherwise indicated, the depositions of the remaining DCS Plaintiffs is consistent with the deemed admissions.

[6] Of the nine DCS Plaintiffs that were not served with RFAs, Edward Estes, IV, P3T, Ltd., Safe Harbor Foundation, Missions to Military #1, and John McFerren were unsure as to whether they were DCS shareholders. (Ex. A, Estes, IV 24; P3T 18; Safe Harbor 20; Missions to Military #1, 20-22; McFerren 30) However, the testimony of these plaintiffs does not create a genuine issue of fact as to whether they were actually DCS shareholders, a fact borne out by the documentary evidence involving DCS, (*see, e.g.,* Ex. B; *see also* Ex. B, Defendant's Exhibit 35 at 1-67), the testimony of other DCS Plaintiffs, (*see, e.g.,* Ex. A), and the admissions of 19 of the 28 DCS Plaintiffs.

6.     They knew that one way DCS planned to invest their money was with the MexBank Currency Exchange program.[7]

7.     They knew that another way DCS planned to invest their money was with Audience Alliance Motion Pictures Studios, an independent movie studio dedicated to promoting films that embrace virtues and values of Christian ethics.

8.     They did not have any personal knowledge of Simmons or Black Diamond when they invested with DCS.[8]

9.     They never had an oral or written agreement with Simmons or Black Diamond to act as their fiduciary with respect to the money they invested.

10.     They never communicated with Simmons or Black Diamond about the money they invested.

11.     They did not know at the time they invested their money with DCS that DCS planned to invest any of the money with Simmons or Black Diamond.

12.     They never brought a claim against Simmons or Black Diamond for the money they lost.

13.     They did not deposit, by wire transfer or other means, any of their money with CommunityOne.

14.     They did not instruct DCS to deposit, by wire transfer or other means, any of their money with CommunityOne.

15.     They did not send their money, by wire transfer or other means, to Keith Simmons or Black Diamond.

16.     They did not instruct DCS to deposit, by wire transfer or other means, any of their money with Simmons or Black Diamond.

17.     They never applied for a bank account at CommunityOne.

18.     They never signed an account agreement with CommunityOne.

---

[7] Edward Estes, IV, P3T, Ltd., Safe Harbor Foundation, Ned Siegel, and Sharon West testified that, prior to sending their investment to DCS, they were not told that DCS planned to invest money with Mexbank or Audience Alliance, though none of these plaintiffs disputed that DCS funds were actually sent to Mexbank or Audience Alliance.

[8] Missions to Military Account #1 and John McFerren testified that they generally knew of Black Diamond prior to investing with DCS, though neither knew specifics about Keith Simmons or Black Diamond. (Ex. A, Missions to Military #1 88-89; McFerren 28).

6

19.    They never opened a bank account at CommunityOne.

20.    They never communicated with CommunityOne about whether they should invest their money with DCS.

21.    They never informed CommunityOne that they invested money with DCS.

22.    They never informed CommunityOne that any of their money was being deposited, or had been deposited, with CommunityOne.

23.    They never informed CommunityOne that any of their money was in a Simmons or Black Diamond bank account at CommunityOne.

24.    They did not place any restrictions on how DCS could invest their money.

25.    They never received any documentation from Jonathan Davey or DCS showing the precise dates, times and amounts of any of their money being deposited at CommunityOne.

26.    They do not know, except what was reported to them by Jonathan Davey, whether any of the money they lost was deposited at CommunityOne.

27.    They do not know for certain whether any of the money they lost was deposited at CommunityOne.[9]

28.    They do know that some of the money they lost was not deposited at CommunityOne.

29.    There is a Private Placement Memorandum, attached as Exhibit A to the First Set of Requests for Admission, that is identical or similar in form and substance to the letter and Private Placement Memorandum that governed their investment in DCS. It provides information and other disclosures about the stock investment.[10]

---

[9] The exception here is the two DCS plaintiffs, Edward Estes, IV, and Ned Siegel, who acknowledge that DCS never sent any of their DCS investment to the Black Diamond Account at CommunityOne.

[10] John McFerren, Missions to Military, and Safe Harbor Foundation, due to the passage of time, couldn't recall if they received similar documents. (Ex. A, McFerren 18; Missions to Military #1 18-19; Safe Harbor Foundation 55:16-19). Prinsen testified that he didn't recognize the documents but, as of February 15, 2018, he had not taken any action to look for documents in his custody, control, or possession that were responsive to CommunityOne's document requests. (Ex. A, Prinsen 17-18; 37-38) Sharon West testified that she didn't recognize the Subscription Agreement, Investment Letter, or Private Placement Memorandum. (Ex. A, West 19-20).

30.     There is a Subscription Agreement and Investment Letter, attached as Exhibit B to the First Set of Requests for Admission, that is identical or similar in form and substance to the Subscription Agreement and Investment Letter that governed the investment of the money they lost in DCS. It includes information related to the purchase of DCS stock.

31.     Jonathan Davey communicated with them on one or more occasions in group emails that began: "Dear Shareholders."[11]

32.     Exhibit C to the First Set of Requests for Admissions is a true and accurate copy of an email Jonathan Davey sent to them dated February 26, 2011. It provides among, other things, the following:[12]

    a.      "DCS was never 100% invested in Keith Simmons/Black Diamond, nor did DCS lose all of its funds in Black Diamond."

    b.      "The principal balance that DCS lost to Black Diamond is 12%. Therefore, the correct amount to show on the form is 12% of your DCS balance."

    c.      "I will be happy to send you an account activity statement which you can use to calculate the 12% lost to Black Diamond."

    d.      "Additionally, as shareholders of Divine Circulation Services, the only entity/individual you sent investment funds was to Divine Circulation Services."

### The Ackerman and Van Horn Plaintiffs

The remaining three plaintiffs in this case, Patrice Ackerman of Arizona, Mary Lynn Van Horn of California and Mary Lynn Van Horn, trustee for her deceased mother, Jeannette Lane, were represented by financial advisor Don Winkler. (Ex. A, Van Horn 57; Ackerman 51). Don Winkler "enticed" Mary Lynn Van Horn and her mother to make their investment with Black

---

[11] All of the DCS Plaintiffs who were deposed in February 2018 other than John McFerren testified that they received multiple e-mail updates from Jonathan Davey that began: "Dear Shareholders." John McFerren, Jonathan Davey's father-in-law, testified that he did not receive e-mail updates from DCS but that his wife received the e-mail updates. (Ex. A, McFerren 20, 75-76).

[12] Although the DCS Plaintiffs who were deposed in February 2018 did not testify as to whether they did or did not receive this specific e-mail, none of the DCS Plaintiffs who were deposed in February 2018 came forward with any evidence to contradict the statements in the February 26, 2011 e-mail that Jonathan Davey sent to DCS Shareholders.

Diamond (Ex. A, Van Horn 55). Winkler also was Ackerman's investment advisor with respect to the Black Diamond investment and the person Ackerman considered to be her fiduciary on the investment. (Ex. A, Ackerman Dep 51). Unlike the DCS Plaintiffs, these three plaintiffs knew about CommunityOne in 2008 because they wired their money at that time directly to the Black Diamond Account at CommunityOne. (Ex. A, Van Horn 65-66; Ex. B, Defendant's Exhibit 11).[13] (Ex. A, Ackerman 95-96; 102, Ex. B, Defendant's Exhibits 1, 3).

Patrice Ackerman and Mary Lynn Van Horn never told anyone at CommunityOne that Keith Simmons or Black Diamond were acting as their fiduciary. (Ex. A, Ackerman 55-56; Van Horn 66). In fact, they never communicated with anyone at CommunityOne. (Ex. A, Van Horn Dep 86-87; Ackerman 9). In addition, they admit that CommunityOne had nothing to do with enticing them to make their investments, did not advise them about their investments, did not make promises to them about their investments, did not receive commissions from them, did not make any references to them about Simmons or Black Diamond and did not make any reports to them about their Black Diamond investments. (Ex. A, Van Horn 55-56; Ackerman 63-64).

### The Black Diamond Account at CommunityOne Was Not a Fiduciary Account

The Black Diamond Account was opened in West Jefferson, North Carolina, on October 11, 2005 as a "BASIC CHECKING" account. (*See* Ex. E, Parsons Dec., ¶ 8, and attached account opening records). It "was not opened as a trust or other fiduciary account" and "if Mr. Simmons had said he wanted to open a trust or other fiduciary account, we would have involved deposit operations and obtained more paperwork." (*Id*. ¶ 11). In short, "this was just a checking account for Black Diamond Capital Solutions, LLC." (*Id*.).

### The Bank Did Not Know that the Black Diamond Account Contained Funds that Belonged to Persons Other than Black Diamond

---

[13] Defendant's Exhibit 11 refreshed Mary Lynn Van Horn's recollection that at the time she transferred her money, it went to CommunityOne Bank. (Ex. A, Van Horn 95).

None of the plaintiffs offered any evidence that CommunityOne knew that Simmons was acting as their fiduciary with respect to funds deposited in the Black Diamond Account. The account opening records also did not reveal that Simmons was acting as a fiduciary with respect to funds deposited in the account. Instead, the account was a basic checking account for what was identified in 2005 as a "Consulting" business. (*Id.* ¶ 13).

Later, in 2008, one of the Bank's employees checked with someone in the branch office in West Jefferson about the nature of the business and learned that Black Diamond was engaged in the "acquisition, development and permanent financing of commercial real estate." (*See* Ex. F, Declaration of Toni Underwood, ¶ 12, and attached records). This information is what the Bank employee relied upon in understanding the large wire transfer activity in the account. (*Id.*). As far as the Bank knew, the funds in the Black Diamond Account belonged to Black Diamond, a company that according to the account opening records was solely owned by Keith Simmons. (*See* Ex. E, Parsons Dec., and attached account opening records). And despite the fact that plaintiffs complain that Simmons diverted their money for his own purposes, Simmons was fully authorized to transfer money from the account of his business. (*Id.* ¶ 16).

## IV. DISCUSSION

**A.     The Uniform Fiduciary Act Claims – Counts I and II of the First Amended Complaint – Fail as a Matter of Law.**

**1.     There Is No Evidence in the Record that CommunityOne Knew That Simmons Was Acting As a Fiduciary For Plaintiffs With Respect to Funds Deposited in the Black Diamond Account.**

In order for plaintiffs to survive summary judgment under the UFA, they must produce evidence that the Bank dealt with another person whom it knows to be a fiduciary with respect to certain funds. *See Buffets, Inc. v. Leischow*, 732 F.3d 889, 900 (8th Cir. 2013) ("For the bank to

act in bad faith in a particular transaction, the bank must be aware that the funds in question are held pursuant to a fiduciary obligation in the first place").[14]

Plaintiffs have produced no evidence – by way of documents or testimony – that CommunityOne knew that Simmons was acting as a fiduciary for plaintiffs or that the money deposited in the Black Diamond Account was being held in a fiduciary capacity for plaintiffs. Rather, the documentary evidence shows that (i) the Black Diamond Account was set up in 2005 as a "Basic Checking" account (Ex. E, Parsons Dec. ¶¶ 8, 10; COMM000069); (ii) it was not set up as a trust or fiduciary account, which would have required additional paperwork and involved deposit operations (*Id.* ¶ 11); and (iii) Simmons had full authority to transfer funds from the account. (*Id.* ¶ 16). Moreover, plaintiffs admit that they never informed CommunityOne that they had a fiduciary relationship with Simmons. (*See, e.g.,* Ex. A).

In the rare UFA cases involving misappropriated investor funds or Ponzi schemes[15], the above rule is the same - courts have required evidence that does not exist here: that the defendant bank knew that its customer was a fiduciary for the investors in order to allow such claims to survive a motion to dismiss or summary judgment. *See, e.g., Petters Co., Inc. v. BMO Harris Bank,*

---

[14] *See also Estate of Barney v. PNC Bank, N.A.*, 714 F.3d 920 (6th Cir. 2013) (finding the UFA applicable because the bank knew of the attorney's fiduciary status for his client's estate, trust, and spouse where the attorney indicated on account opening documentation that he was executor of the estate and trustee of the trust when opening the estate and trust accounts); *Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1043 (8th Cir. 2006) ("American Express had no actual knowledge that Mayfield was Watson's fiduciary when it processed the checks; thus, it could not have known that Mayfield was using fiduciary funds to pay her personal obligations"); *Terre Haute Indus., Inc. v. Pawlik*, 765 F. Supp. 925, 929 (N.D. Ill. 1991) ("[T]he Uniform Fiduciaries Act applies only to situations where the person depositing the check is *known by the bank to be a fiduciary*") (emphasis in original).

[15] Claims under the UFA more typically arise under much different facts involving a corporation seeking to hold its bank liable for misappropriation of funds by its corporate officers. *See, e.g.*, *Maryland Cas. Co. v. Bank of Charlotte*, 340 F.2d 550 (4th Cir. 1965) (corporation suing bank for knowingly or in bad faith allowing its corporate officer to breach fiduciary duty).

*N.A.*, 565 B.R. 154 (Bankr. D. Minn. 2017) (defendant bank signed Deposit Control Agreements providing it would hold funds for the benefit of the Ponzi scheme entity and its investors); *U.S. Commodity Futures Trading Commission v. U.S. Bank, N.A.*, No. 13-CV-2041-LRR, 2014 WL 6474183 (N.D. Iowa Nov. 19, 2014) (unpublished)[16] (Ponzi scheme entity opened a "Customer Segregated Account" and the bank provided a letter of acknowledgement memorializing that the entity notified the bank that the funds deposited in the account constitute monies belonging to its futures and options customers which it was required to segregate under the Commodity Exchange Act).

In *Rosemann v. St. Louis Bank*, 858 F.3d 488 (8th Cir. 2017), a case brought by two of the plaintiffs' attorneys in this case, the Eighth Circuit upheld summary judgment for a bank on UFA claims brought by investors in a Ponzi scheme. In that case, the perpetrator of the Ponzi scheme was an attorney, and he deposited most of the investor's funds into his IOLTA account at St. Louis Bank before transferring the funds to other accounts. *Id.* at 492. The court noted that there was no evidence that the bank understood the fiduciary nature of the funds or the source of the funds. *Id.* at 495. Although the court acknowledged that an IOLTA account is a "fiduciary account," it said that it differed from a typical trust account because it is a demand deposit account where the funds may be owed to the attorney or the attorney's various clients. *Id.* at 495, 498. Because the account was not a true trust account but instead held commingled funds of various clients and the attorney, the court held that the bank could not have acted in bad faith or had actual knowledge of misappropriation by processing any particular transaction. *Id.* at 496-98.

The Black Diamond Account was not even a hybrid fiduciary account, like the IOLTA account in *Rosemann*, and it certainly wasn't set up as a full fiduciary account, trust account, or

---

[16] Copies of unpublished case law cited herein are attached to this brief as Exhibit J.

customer segregated account like the ones in *Petters. Co.* or *U.S. Bank*. (Ex. E, Parsons Dec. ¶¶ 8,

10, 11; COMM000069). It was a simply a "BASIC CHECKING" account. (*Id.* at ¶8). There was

no letter from the Bank acknowledging that fiduciary funds were deposited into the account, nor a

Deposit Control Agreement specifying the existence of fiduciary funds. Accordingly, like the

defendant bank in *Rosemann*, CommunityOne could not have acted in bad faith or had actual

knowledge of misappropriation by processing any particular transaction.

While the record is clear that the Black Diamond Account was not a fiduciary account, the

Bank's records are conflicting as to the nature of Black Diamond's business, but this conflict does

not create a genuine issue of material fact. The Bank's 2005 account opening records show that

Black Diamond was in the business of "consulting" (*Id.* at ¶ 8; COMM000069), while the Bank's

2008 client research records in the Yellow Hammer BSA software show that Black Diamond was

in the business of acquisition, development, and permanent financing of commercial real estate

(Ex. F, Underwood Dec. ¶ 12; COMM000008). Those same 2008 client research records have an

NAICS (North American Industry Classification System) number listed in the BSA software for

Black Diamond (*Id.*)[17] that plaintiffs point to as evidence that Black Diamond was engaged in the

business of "Investment Advice" according to the NAICS website maintained by the United States

Census Bureau (Ex. G, CommunityOne 30(b)(6) 28, Ex. H, Plaintiff's Exhibit 28).[18] These

references to Black Diamond's business are immaterial, however, because even if someone at the

---

[17] There is no evidence in the record as to how this NAICS number was assigned in the Yellow Hammer software, when it was assigned or who made the assignment.

[18] The definition according to the North American Industry Classification System is: "This industry comprises establishments primarily engaged in providing customized investment advice to clients on a fee basis, but do not have authority to execute trades. Primary activities performed by establishments in this industry are providing financial planning advice and investment counseling to meet the goals and needs of specific clients." Examples listed include financial investment advice, investment advisory services and financial planning services. (Ex. H, CommunityOne 30(b)(6) 28, Ex. I, Plaintiff's Exhibit 28).

Bank had known that some part of Black Diamond's business was involved in offering financial or investment advice, a financial or investment advisor can have a personal business account, or a fiduciary account, or both. The core issue is not the nature of the business that opens the account but whether the bank knew that the funds in question are held pursuant to a fiduciary obligation.

If plaintiffs had desired to have their money protected in a fiduciary account, they could have insisted that Black Diamond and Keith Simmons set up such an account, or at the very least, they could have ensured that CommunityOne knew that the funds deposited were fiduciary funds. They did neither. Having failed to do so, and having failed to present any evidence that CommunityOne knew of Simmons' fiduciary status, summary judgment should be granted in favor of CommunityOne on Counts I and II.

## 2. There is No Evidence in the Record that CommunityOne Had Actual Knowledge That Simmons Diverted Funds in Breach of a Fiduciary Duty.

Because the record shows that CommunityOne did not know that Simmons was acting as a fiduciary for plaintiffs (*see* Section IV.A.1 above), it did not know that Simmons was diverting funds in breach of a fiduciary duty. Emily Parsons, the CommunityOne employee who opened the Black Diamond account, testified that during the entire time the Black Diamond account was open, she had no knowledge that Black Diamond represented investors, no knowledge that Simmons told investors that he was investing their money in a foreign currency exchange program, and no knowledge that funds deposited in the Black Diamond account belonged to others or were part of a Ponzi scheme. (Ex. E, Parsons Dec. at ¶ 20). She also was unaware of anyone else at CommunityOne having such knowledge. (*Id.*). Accordingly, because plaintiffs have not come forward with any evidence that CommunityOne had actual knowledge that Simmons was breaching a fiduciary duty when CommunityOne processed transactions in the Black Diamond account on his authority, CommunityOne is entitled to summary judgment on Count I.

14

### 3. Plaintiffs Seek to Impose Duties on the Bank Not Required by the UFA

Because the record shows that CommunityOne did not know that Simmons was acting as a fiduciary for Plaintiffs, it is illogical to suggest that CommunityOne acted in bad faith by "not investigating the source of *the fiduciary funds*" in the Black Diamond account.[19] With this logic, Plaintiffs seek to create a duty - and with that manufactured duty, a "bad faith" claim - based on the 2011 Deferred Prosecution Agreement entered into by the Bank ("DPA") and the Bank's obligations under the Bank Secrecy Act ("BSA").[20] For reasons discussed below, the record does not support a bad faith claim and BSA non-compliance is not evidence of a UFA Violation.

### a. The Deferred Prosecution Agreement is Inadmissible and Immaterial.

The DPA did not result in a conviction against CommunityOne and even if it had, it is not evidence of a UFA violation.[21] The UFA focuses on misappropriation of fiduciary funds by known

---

[19]  Plaintiffs allege in paragraphs 98 of the First Amended Complaint, that CommunityOne's actions amounted to bad faith by not investigating "the source of fiduciary funds" and in paragraph 97, they link the obligation to do so to the allegation – for which there is no evidence (*See* Section IV.A.1 above) – that the Bank had actual knowledge of the misappropriation of "fiduciary funds."

[20]  Defendant believes that plaintiffs will focus on the BSA and DPA in arguing that CommunityOne acted in bad faith, because the First Amended Complaint is littered with references to the DPA entered into by the Bank in April 2011 (DE No. 30-1, First Am. Compl., ¶ 42) and the Bank's activities with respect to the Yellow Hammer software the Bank used for BSA compliance (*Id.* at ¶¶ 38-41 and 63-79). For instance, plaintiffs allege with respect to the BSA related software, that the Bank received "hundreds of alerts" of "suspicious activity" (*Id.* at ¶ 38) and did "nothing to stop or deter the activity" (*Id.* at ¶ 39), that Simmons' account activity was "repeatedly flagged" (*Id.* at ¶ 40), that the Bank was "made aware of hundreds of alerts" (paragraph 41), that were "potentially suspicious" (*Id.* at ¶¶ 63, 64 and 75), that the Bank ignored in "bad faith" (*Id.* at ¶¶ 75, 76, 78), and therefore, the Bank violated the UFA (*Id.* at ¶ 79).

[21]  On April 27, 2011, the Government filed a single-count Bill of Information against CommunityOne for failure to maintain an anti-money laundering program. *See United States v. CommunityOne Bank, N.A.*, No. 3:11-cr-122-RJC-DSC (W.D.N.C. Apr. 27, 2011, DE. No. 1). That same day, CommunityOne entered into a Deferred Prosecution Agreement ("DPA") with the Government. (*Id.* at ¶ 31). On September 26, 2013, the Government filed a Motion to Dismiss the charges against CommunityOne on grounds that the Bank had fulfilled its obligations under the DPA. (*Id.* at DE Nos. 9 and 10). The Motion was granted the following day. (*Id.*). Thus, the Bank was not convicted of violating the BSA.

fiduciaries, whereas the BSA focuses on money-laundering, irrespective of the type of account. And because the BSA does not create a private right of action (*see AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004); *see also Bottom v. Bailey*, No. 1:12cv97, 2013 WL 431824, at *5 (W.D.N.C. Feb. 4, 2013) (unpublished)), the BSA "[does] not provide a basis for imposing a duty of care upon the defendant." *Aiken v. Interglobal Mergers and Acquisitions*, No. 05–CV–5503, 2006 WL 1878323, at *2 (S.D.N.Y. Jul. 5, 2006) (unpublished). As one court has explained, "[t]he obligation under that statute is to the government rather than some remote victim. The obligation is not to roam through its customers looking for crooks and terrorists." *Marlin v. Moody Nat'l Bank, N.A.*, No. 04–4443, 2006 WL 2382325, at *7 (S.D. Tex. Aug. 16, 2006) *aff'd*, 248 F. App'x 534 (5th Cir. 2007); *see also In re Agape Litig.*, 681 F. Supp. 2d 352, 360–61 (E.D.N.Y. 2010). Accordingly, the DPA is not admissible as evidence of a UFA violation. *See Schenone v. Zimmer, Inc.*, 2014 WL 12619911 at *2 (M.D. Fla. Aug. 27, 2014) (unpublished) (excluding evidence of a DPA in another type of proceeding as "irrelevant and overwhelmingly prejudicial").

### b. Failure to Comply with BSA Policies, Procedures, Laws or Regulations Does Not Create a Genuine Issue of Material Fact Under Count II.

Plaintiffs contend that the Bank acted in bad faith by failing to investigate the source of the "fiduciary funds" in the Black Diamond Account, and that "bad faith" under the UFA is "whether it is commercially unjustifiable for CommunityOne Bank to refuse to learn facts readily available." (DE No. 30-1, First Am. Compl. at ¶ 92). The actual test for bad faith is more stringent, involving "indicia of dishonest conduct" or a showing of facts and circumstances "so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Edwards v. Northwestern Bank,* 39 N.C. App. 261, 250 S.E. 2d 651 (1979); *Rosemann*, 858 F.3d 488, 497 (8th Cir. 2017) (internal

citations omitted). Applying this test here, the bad faith claim fails, because the record is devoid of evidence of any dishonest conduct by the Bank, and because the first cogent and obvious fact that must exist before remaining passive can create liability under the UFA – which fact does not exist (*see* Section IV.A.1 above) – is actual knowledge by the Bank that Simmons was acting as a fiduciary with respect to funds in the Black Diamond Account. Importantly, unlike the standard for a statute of limitations defense, there is no duty by a bank under the UFA to exercise reasonable diligence to discover whether an account holder is acting as a fiduciary or whether a business checking account has fiduciary funds deposited in it. The bank either knows or it doesn't know whether a customer is a fiduciary, because "[a] showing of mere negligence is clearly not sufficient to establish liability." *Edwards* 39 N.C. App. at 268, 250 S.E.2d at 656 (1979)[22]

Even if the Bank had known that Simmons was acting as a fiduciary for plaintiffs, which it did not, the failure to have or follow an effective money-laundering program is not the same as allowing a known fiduciary to divert fiduciary funds in violation of the UFA.[23] The first failure concerns the BSA, for which there is no private cause of action, and the second failure requires proof under the UFA that the Bank knew that the account holder was a fiduciary with respect to funds in the account. (*See* IV.A.1 above). By focusing on BSA policies, procedures, laws and regulations, plaintiffs wrongly conflate duties imposed on banks by the BSA - duties which banks

---

[22] Plaintiffs myopic focus in the First Amended Complaint on "alerts" generated by the Bank's BSA software– which actually are called "worklists" in the software –together with evidence of numerous and substantial wire transfers into and out of the Black Diamond Account, may be relevant in determining BSA compliance, but they are immaterial in this UFA case, because there is nothing in them that reveal that Simmons was acting as a fiduciary or that the funds being wired to and from the account were fiduciary funds.

[23] Plaintiffs served 33 document requests and devoted 8 topics in their 30(b)(6) deposition of CommunityOne to policies and procedures and related matters that deal with the BSA, and BSA related activities, like money-laundering. (*See* Ex. G, CommunityOne 30(b)(6)Depo. 8:10-12, Ex. H. Plaintiff's Exhibit 1).

owe only to the Government irrespective of the type of account - with UFA duties owed by banks for known fiduciary accounts. They employ an unfounded legal cause and effect argument, the cause being the Bank's alleged failure to comply with the BSA, and the effect being the loss of their money.

Courts have held that the failure to comply with BSA requirements – including such actions or inactions related to the filing of a Suspicious Activity Report ("SAR") – is not evidence of bad faith under the UFA. For instance, in *Rosemann v. St. Louis Bank*, 2015 U.S. Dist. LEXIS 188886, *1 (E.D. Mo. Nov. 17, 2015), *aff'd* 858 F.3d 488 (8th Cir. 2017), the court found that compliance with federal regulations cannot be used to infer bad faith for purposes of the UFA. The court explained that "the issue of whether [the bank] filed a SAR, informed plaintiffs of such filing or was barred from discussing [the bad actor's] accounts with Plaintiffs [was] irrelevant to the ultimate issue of [the bank's] liability." *Id.* Additionally, it noted that the bank's "failure to file an SAR, or any failure to disclose the filing of a SAR, is independent of plaintiffs' claims in the instant action." *Id.* It concluded that "[t]o the extent that [the bank] argues that compliance with federal regulations cannot be used to infer bad faith, the court agrees." *Id.* at 37–38. For these reasons, CommunityOne's compliance or non-compliance with BSA policies, procedures, laws or regulations is immaterial to whether CommunityOne violated the UFA and creates no genuine issues of material fact on the bad faith claim under Count II.

4.    **Plaintiffs Cannot Support Their Bad Faith Argument Under Count II Without Expert Testimony.**

Plaintiffs contend that bad faith under the UFA is measured by what is "commercially unjustifiable" and that the Bank used "procedures that unreasonably vary from general banking usage." (DE No. 30-1, First Am. Compl., ¶¶ 92, 95). Such an argument requires proof of the standard of care. *See Pernikoff Constr. Co. v. U.S. Bank, N.A.*, No. 4:09CV894 JCH, 2010 WL

18

3258399, (E.D. Mo. Aug. 16, 2010) (unpublished) (holding that to succeed on UFA claim expert testimony was required to establish "'[w]hat constitutes reasonable or justifiable banking practices . . . [because processing checks] is not a matter of common knowledge, and requires evidence of reasonable banking practices in the industry.")[24] Here, plaintiffs did not designate an expert to testify and by failing to do so, even if the Bank had known that Simmons was acting as a fiduciary, plaintiffs cannot show that CommunityOne violated the applicable standard of care.

**B.     The DCS Plaintiffs' Claims Should Be Dismissed, Because Even if the Black Diamond Account Was a Fiduciary Account and Even if there Was Evidence of Actual Knowledge or Bad Faith to Support a UFA Claim, the DCS Plaintiffs Lack Standing To Bring Their Claims Because They Invested Their Money in DCS And Became Shareholders of DCS.**

As set forth in Section III, the DCS Plaintiffs are shareholders in DCS. As shareholders, the DCS Plaintiffs lack standing to bring claims related to any harm that CommunityOne, Simmons, or Black Diamond allegedly caused DCS or the value of DCS shares. Apart from a derivative action, a shareholder or member of an LLC generally lacks standing to bring a lawsuit for wrongful acts a third party commits against an LLC or corporation.[25] *See Green v. Freeman,* 367 N.C. 136, 142, 749 S.E.2d 262, 268 (N.C. 2013) ("The general rule is that '[s]hareholders, creditors or guarantors of corporations generally may not bring individual actions to recover what

---

[24] *See also Rosemann v. Sigillito*, 785 F.3d 1175, 1180 (8th Cir. 2015) (allegations that turn on what a professional would do "under the same or similar circumstances" require expert testimony because they "involve 'somewhat arcane subjects to the ordinary juror,' subjects that go beyond the 'common knowledge and experience' of most lay persons") (citations omitted); *In re Taneja*, 743 F.3d 423, 431 (4th Cir. 2014) (observing that expertise would be required to testify about certain banking industry practices).

[25] Divine Circulation Services, LLC is a domestic limited liability company incorporated and registered with the Ohio Secretary of State by Jonathan Davey on or around July 16, 2007. Documents produced in discovery indicate that Divine Circulation Services, Ltd. is a passive foreign investment company that was based in Belize City, Belize. Regardless of whether the DCS Plaintiffs are shareholders of a corporation or members of an LLC, the standing argument applies with equal weight.

19

they consider their share of the damages suffered by the corporation.'"). North Carolina recognizes two exceptions to this rule: when a plaintiff can show (1) the defendant owed the plaintiff a special duty, or (2) the plaintiff suffered an injury separate and distinct from other shareholders. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 657–58, 488 S.E.2d 215, 219 (1997).[26]

In *Barger*, the Supreme Court of North Carolina held that shareholder plaintiffs could not pursue individual causes of action against a third-party accounting firm for wrongs to the corporation that resulted in the diminution or destruction of the value of their stock. 488 S.E.2d at 219. The court concluded the *Barger* plaintiffs could not sue under the second exception because the shareholders did not allege a "peculiar or personal" injury to themselves. It explained that "[a]n injury is peculiar or personal to the shareholder if a legal basis exists to support plaintiffs' allegations of an individual loss, separate and distinct from any damage suffered by the corporation." *Id.* at 220. The court also found the first exception inapplicable, explaining that such a duty may "arise from contract or otherwise" and "must be one that the alleged wrongdoer owed directly to the shareholder as an individual." *Id.* (citation omitted).

Here, plaintiffs allege that Simmons "misappropriated fiduciary funds by paying himself with and misappropriating investor funds from the Black Diamond account at the Bank." (Am. Compl. ¶ 71). However, unlike the Ackerman and Van Horn Plaintiffs, the DCS Plaintiffs did not deposit any investor funds in the Black Diamond Account at CommunityOne. Instead, they invested in DCS. Even if they had proof that the Bank violated the UFA, the harm for such violation would be harm to DCS, directly, and to them, only indirectly. Neither of the exceptions to the rule against shareholder lawsuits applies here. First, the Bank does not owe the DCS

---

[26] North Carolina law and Ohio law have similar exceptions to the shareholder standing rule. *See Adair v. Wozniak*, 492 N.E.2d 426, 428 (Ohio 1986). Accordingly, the DCS Plaintiffs' lack standing to bring claims against CommunityOne regardless of whether this Court applies North Carolina or Ohio law on shareholder standing.

Plaintiffs any special duties. There were no contracts between the Bank and the DCS Plaintiffs, (*See, e.g.,* Ex. A), they did not have accounts with the Bank, (*Id.*), and their fiduciary duty claims in this action were voluntarily dismissed. (DE No. 15) Second, none of the DCS Plaintiffs allege losses distinct from the losses suffered by other shareholders. Their losses are strictly financial in nature and concern the loss of the value of their shares. *See Munoz v. Suntrust Bank*, 2016 WL 3176594, at *6 (W.D.N.C. June 3, 2016), *aff'd*, 674 Fed. Appx. 321 (4th Cir. 2017) (dismissing shareholder's claim because shareholder lacked standing where claims arose from fraud perpetrated on company and the complaint lacked allegations of individual harm to plaintiff other than derivative harm due to shareholder status). Accordingly, because the DCS Plaintiffs invested in and became shareholders of DCS, and because DCS and not the DCS Plaintiffs wired funds to the Black Diamond Account, the DCS Plaintiffs lack standing to bring the claims in this case.

**C.    Two of the DCS Plaintiffs, Edward Estes, IV and Ned Siegel, Have No Claim Because the Money They Invested in DCS Was Never Sent to the Black Diamond Account.**

Like the other DCS Plaintiffs, Edward Estes, IV and Ned Siegel did not send money to CommunityOne but sent it to DCS. The striking difference between their investment in DCS and the investments by the other DCS Plaintiffs is that Estes, IV and Siegel sent money to DCS in May and July of 2009, <u>after</u> DCS stopped sending DCS funds to Black Diamond. (Ex. A, Estes, IV 33; Siegel 62-63) (Ex. C, Nixon 428, Government's Exhibit 2C) This means that Estes and Siegel were not impacted, even indirectly, by the loss of DCS funds in the Black Diamond Account.

Despite these facts, Estes, IV and Siegel argue that CommunityOne should have stopped Keith Simmons from operating his Ponzi scheme, and if it had, they would not have invested money with DCS operator Jonathan Davey. (Ex. A, Estes, IV 33, Siegel 62-63) Their argument is contrary to their own claims and the UFA, itself, because Count I and Count II allege violations of the UFA that were a "direct and proximate cause" of damage to them. (*See* DE No. 30-1, First Am.

21

Compl. at ¶¶ 89, 99) What Estes IV and Siegel fail to recognize is that the UFA only makes a bank liable to a principal when: (1) a fiduciary draws a check upon his principal's account; and (2) the "bank pays [the] check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with knowledge of such facts that its action in paying the check amounts to bad faith." *See* N.C.G.S.A. §32-9 (2018); *See Maryland Cas. Co. v. Bank of Charlotte*, 340 F.2d 550, 552 (4th Cir. 1965). Estes, IV and Siegel were not principals to whom the Bank could be liable because they did not have any money in the Black Diamond Account, either directly or indirectly. Accordingly, their UFA claims fail as a matter of law.

**D.    The Ackerman and the Van Horn Claims are Barred by the Statute of Limitations.**

This Court previously held that the three year statute of limitations for plaintiffs' UFA claims are subject to the discovery rule, which provides that the statute of limitations begins to run when a plaintiff knew or, through the exercise of reasonable due diligence, should have known about the alleged wrongdoing giving rise to their claims. (DE No. 30-1, at 7-8) "[A] plaintiff has a duty to exercise reasonable diligence to discover the [conduct] that give rise to [its] claim" (*Doe v. Roman Catholic Diocese of Charlotte, N.C.*, 242 N.C. App. 538, 542, 775 S.E.2d 918, 922 (2015)), and "[w]hen an event occurs to excite the aggrieved party's suspicion or put [it] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the [conduct], that party is deemed to have inquiry notice of the same." *See KB Aircraft Acquisition, LLC v. Berry*, __ N.C. App. __, __, 790 S.E.2d 559, 569-70 (N.C. Ct. App. 2016) (internal quotations omitted) This Court previously observed that "[i]f the facts are not in conflict, then whether a claim is barred by the statute of limitations becomes a question of law." (DE No. 38, at 9).

Unlike the DCS Plaintiffs, the Ackerman and Van Horn Plaintiffs knew exactly where their money was deposited in 2008, because they wired the money directly to CommunityOne from

their personal accounts. (Ex. A, Van Horn 65-66, Defendant's Exhibit 11; Ackerman 95-96, 102, Ex. B, Defendant's Exhibits 1, 3). They also were suspicious early on about what was going on with the funds they had deposited at CommunityOne. On November 20, 2009, Mary Lynn Van Horn exchanged emails with Keith Simmons in which she questioned whether he had an SEC license, asked why he wouldn't release her and her mother's money and said "This makes no sense!" (Ex. A, Van Horn, 103; Ex. B, Defendant's Exhibit 17). Both she and her mother were concerned about what was happening with their money in November 2009. (Ex. A, Van Horn Dep 103-109) Similarly, Ackerman made withdrawal requests that were not honored in 2009, (Ex. A, Ackerman 107-108), requested all her money back from Black Diamond in October 2009, (Ex. A, Ackerman 134-136, Ex. B, Defendant's Exhibit 6), and filed two lawsuits against Black Diamond and Keith Simmons, one in August 2010 and one in October 2010.[27] (Ex. A, Ackerman 16; Ex. J, Ackerman lawsuits) Also, Ackerman and Van Horn both knew of Simmons 2009 arrest in late 2009. (Ex. A, Ackerman 117; Van Horn 87-88)

Here, because these plaintiffs were well aware of Keith Simmons's misconduct as early as 2009, knew that Black Diamond had a CommunityOne bank account in 2008, knew their money was deposited at CommunityOne in that account in 2008, were suspicious enough to write to Simmons in 2009 and file lawsuits against him in 2010 and knew that CommunityOne had not prevented the loss of their money on or before 2010 – which is the key fact at the core of their claim - a reasonable plaintiff armed with such knowledge would have investigated anything else that needed to be known to file this lawsuit against CommunityOne. However, Ackerman and Van

---

[27] Notably, the October lawsuit named Black Diamond, Keith Simmons, and Black Corporations or Limited Liability Companies I-X and ABC Partnerships I-X. The complaint alleged that Black Corporations or Limited Liability Companies I-X and ABC Partnerships I-X "are persons, companies, corporations, partnerships, or other entities that are believed to have participated in the wrongs alleged in the complaint." (Ex. I, Oct. Compl. at ¶ 6).

Horn did not contact anyone at the Bank or do any investigation of any legal or factual nature concerning the Bank. (Ex. A, Ackerman 55-56, 92, 124-127; Van Horn 112-115) Instead, they sat on their claims for more than five years until they were recruited by plaintiffs' counsel to participate in this lawsuit. (Ex. A, Ackerman 87-92; Van Horn 62-63)

## E.    The DCS Plaintiffs' Claims are Barred by the Statute of Limitations.

The DCS Plaintiffs' claims are also barred by the statute of limitations because they were aware, or should have been aware, of numerous facts that would have caused a reasonable plaintiff to investigate and discover any claims arising from their DCS losses prior to August 31, 2012.

For instance, at least one plaintiff made a withdrawal request in 2009 that was not honored, (*See, e.g.,* Ex. A), all of the DCS Plaintiffs knew of the criminal charges against Keith Simmons by early 2010, (Ex. A, Richards 151-154; Ex. B, Defendant's Exhibit 83 at 173-176), at least one plaintiff threatened a lawsuit against DCS in early 2010, (Ex. A, CCR Data 58-60, 98-99, 156-159; Ex. B, Defendant's Exhibit 95 at 170-174), multiple DCS plaintiffs met with the FBI prior to August 31, 2012, (*Id.*), many followed the Keith Simmons criminal trial, (*Id.*), almost all of the DCS Plaintiffs were aware of the CFTC's case against DCS leader Jonathan Davey, and Jonathan Davey was criminally charged on February 22, 2012. (*Id.*) The DCS Plaintiffs also failed to do what any reasonable person would have done after learning of Keith Simmons's criminal conduct, including: hiring a private investigator or attorney to determine what happened to their investment and who they might have claims against, (*Id.*), attend the criminal trial of Keith Simmons, (*Id.*), or take affirmative action to determine the name of the bank where Black Diamond had an account.[28] (*Id.*) Thus, when considering what the DCS Plaintiffs knew and what they failed to do

---

[28] Safe Harbor Foundation cannot credibly argue that it did not know where Black Diamond banked because Safe Harbor Foundation's President Jonathan Davey also controlled DCS and would have been aware that DCS was sending DCS funds to a Black Diamond account at CommunityOne.

investigate or prosecute their claims, the DCS Plaintiffs should have discovered their claims, prior to August 31, 2012 and, accordingly, the DCS Plaintiffs' claims are time barred as a matter of law.

**F.      The Claims of Jeannette Lane, Deceased, Should be Dismissed Because The Record Does Not Show that Her Daughter Has the Right to Bring the Claim.**

The First Amended Complaint names Mary Van Horn, individually, and Mary Lynn Van Horn, trustee for J. Lane. The pleading does not, however, supply any information or documents about the authority of Mary Lynn Van Horn to bring a claim for her mother. In her deposition, Mary Lynn Van Horn recalled that she was the executor of her mother's estate in 2014, that she opened the estate, that the estate was closed not long after she died, that there were limited assets in the estate, that her mother never mentioned filing a lawsuit against Keith Simmons, Don Winkler or Black Diamond, that she couldn't think of any kind of document her mother ever signed that gave her the right to file a lawsuit on her behalf, and that she does not recall the court ever entering an order giving her the right to file a claim for her mother.  (Ex. A, Van Horn 15-16, 19). When asked whether she had the right to bring a claim for her mother, she said she would have to ask the lawyer who helped her with the estate. (*Id.* at 19). She said she sent paperwork to her lawyer in this case about the estate (*Id.* at 9), but despite requests by the Bank's counsel to Plaintiff's counsel for the records, none were provided. For these reasons, even if Jeanette Lane had valid UFA claims, the record does not support Mary Lynn Van Horn's right to bring the claims.

**V. CONCLUSION**

For the foregoing reasons, CommunityOne Bank respectfully requests that the Court grant summary judgment in CommunityOne's favor on both counts in the First Amended Complaint and dismiss those claims with prejudice.

25

Respectfully submitted this 16th day of March, 2018.

**McGuireWoods LLP**

<u>s/ H. Landis Wade, Jr.</u>
H. Landis Wade, Jr.
N.C. Bar No. 11134
T. Richmond McPherson, III
N.C. Bar No. 41439
Richard H. Conner, III
N.C. Bar No. 28480
MCGUIREWOODS LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 343-2000
Email:  lwade@mcguirewoods.com

*Attorneys for CommunityOne Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing **DEFENDANT COMMUNITYONE BANK, N.A.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** by electronic filing, email or U.S. mail, postage prepaid, as indicated below, to the following:

Edward H. Nicholson, Jr.
McConnell & Sneed, LLC
212 S. Tryon Street, Suite 1725
Charlotte, NC 28281
Email: nicholsonshumaker@att.net
(by electronic filing)

Jonathan F. Andres
Jonathan F. Andres P.C.
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105
Email: andres@andreslawpc.com
(by electronic filing)

Sebastian Rucci
Law Offices of Sebastian Rucci
16400 Pacific Coast Hwy, Suite 212
Huntington Beach, CA 92649
Email: SebRucci@gmail.com
(by electronic filing)

*Attorneys for Plaintiffs*

This the 16th day of March, 2018.

/s/ H. Landis Wade, Jr.
H. Landis Wade, Jr.
*Attorney for CommunityOne Bank*

27